2020 IL App (1st) 161515-U

No. 1-16-1515

Order filed February 7, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 3175 |
| | ) | |
| JOSE BAHENA, | ) | Honorable |
| Defendant-Appellant. | ) | Maura Slattery Boyle, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the denial of defendant's motion for leave to file a successive postconviction petition, because (1) defendant did not set forth a colorable claim of actual innocence, and (2) he failed to satisfy the cause and prejudice test where he cannot demonstrate the requisite "prejudice" under the Post-Conviction Hearing Act.

¶ 2    Defendant Jose Bahena appeals from the circuit court's denial of his motion for leave to file a successive post-conviction petition pursuant to the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2016). On appeal, defendant contends that the court erred in denying

his motion because: (1) he presented a claim of actual innocence based on the affidavit of Jason Brock, the State's "key" witness at trial; and (2) he established cause and prejudice for his claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) through its knowing use of Brock's perjured testimony. For the following reasons, we affirm.

¶ 3     Following a 2010 jury trial, defendant was convicted of first degree murder and sentenced to 45 years in prison, which included a 25-year enhancement for personally discharging a firearm. We affirmed on direct appeal. *People v. Bahena*, 2012 IL App (1st) 102054-U. Because we set forth the facts on direct appeal, we recount them here to the extent necessary to resolve the issues raised.

¶ 4     Defendant's conviction arose from the death of Juan Lebron at a liquor store in the early morning hours of January 8, 2008. The shooting occurred during an argument that involved defendant as well as Lebron, Jason Brock, and Omar Davila, three members of a rival street gang. At trial, defendant argued that he shot Lebron in self-defense.

¶ 5     Before defendant's trial, the court granted the State's motion *in limine*, barring evidence of prior violent acts by Lebron or Brock.

¶ 6     At trial, Omar Davila testified that on January 8, 2008, he, Brock, and Lebron went to a liquor store. Inside the store, two men asked Davila, Brock, and Lebron what gang they belonged to; Lebron responded that they were Folks. Davila recognized the two men as members of the LaFamilia Stones gang, which was opposed to the Folks. Another male, later identified as Oscar Alvarez, left the store after hearing the conversation.

¶ 7     Davila testified that the confrontation escalated into an argument, and that "bottles were picked up." The store clerk tried to "calm everybody down." Alvarez reentered the store with

other individuals, including defendant. Defendant pulled out a gun and fired, striking Lebron. Davila, Lebron and Brock were not armed. On cross-examination, Davila said that he and Brock belonged to the Simon City Royals, a gang that was part of the Folks nation.

¶ 8      Saleh Abdulla, a clerk in the liquor store, testified that two individuals went to the back of the store to the bathroom, after which three people entered and went to the rear of the store. After Abdulla heard an argument between the two groups, he approached the men and told them he did not want trouble in the store. Three more individuals (including defendant) entered from outside and joined the initial group of two. Defendant's group was leaving the store until one of the people in the other group (later identified as Brock) "took his jacket off" and "start[ed] calling names." Defendant pulled out a gun and fired. Abdulla did not see anyone else with a firearm. The jury viewed video footage of the shooting during Abdulla's testimony.

¶ 9      Rigoberto Camacho testified that he and a group of friends drove to the liquor store that night. Outside the store, Camacho recognized defendant and spoke to him in the parking lot. Alvarez (who was also a friend of Camacho) came out of the store and said that "some guys" were "trying to get Ramiro," who was a friend. Camacho testified that he and his friends, including defendant, were members of the LaFamilia Stones street gang.

¶ 10     Camacho and defendant went into the liquor store, where Ramiro was arguing with three men: Brock, Lebron, and Davila. Camacho thought the men were going to beat up Ramiro "because they had bottles in their hands." Brock was "going at it with everybody" and "going at it with [defendant]." Brock said "F*** ya'll" and used the phrase "Stone killer." Camacho believed that Brock was "trying to threaten us." At one point, Brock used a cell phone to call someone and told them to bring a "thumper," referring to a gun.

¶ 11    Lebron stepped in between Brock and defendant. Brock "took off his coat." Camacho believed that Brock was preparing to hit defendant. Camacho saw defendant point a gun at Brock and Lebron before hearing shots. On cross-examination, Camacho testified that when Brock "called somebody on the phone for a thumper," he "thought one of us was going to get shot."

¶ 12    Brock testified that he, Davila and Lebron were friends. On the evening of the incident, the three men entered the liquor store and went to the rear of the store, where they saw two other men. One of the two men asked Lebron what gang he was in. The "other individual grabbed a bottle off the shelf," and Brock responded by also grabbing a bottle. One of the two men asked Brock what gang he was in, and Brock responded that he was a Simon City Royal. A store clerk temporarily de-escalated the situation. However, one of the individuals ran out of the store and returned with three other men, including defendant.

¶ 13    Brock testified that he felt "trapped" and that he called a friend on his phone and requested a gun. Brock acknowledged that he yelled "FSK" at the other group, meaning "LaFamilia Stone Killer," to "disrespect" that gang. He recalled that Lebron was "trying to be the peacemaker" and told Brock "to back up, to leave him alone." As defendant approached, Lebron "grabbed [Brock] and tried to place [Brock] behind him." Lebron pushed defendant, and defendant fired a total of five shots. On cross-examination, Brock acknowledged that defendant was the only person armed with a gun.

¶ 14    A medical examiner testified that Lebron sustained five gunshot wounds and that the manner of death was homicide.

¶ 15    Defendant testified that he was a member of the LaFamilia Stones gang. On the night of the shooting, he went to the liquor store with Alvarez and Ramiro. Outside, defendant saw two

people he knew: Camacho and Sergio.[1] Alvarez, Ramiro, and Sergio entered the store, while defendant stayed outside talking with Camacho. Alvarez then ran out of the store and said that "some guys were going to jump Ramiro inside the store." Defendant then entered the store.

¶ 16    Inside, defendant saw three individuals with bottles in their hands. He heard one of those individuals, Brock, saying "Familia Stone killer" and "we going to kill you." Defendant also heard Brock call someone and refer to a gun. Defendant believed that Brock "was going to shoot us." Defendant testified that Brock took off his coat and was "confrontational." Brock reached toward his waist for what defendant thought was a gun, and Lebron "pushed [defendant] back." Defendant started shooting "[b]ecause I was in fear for my life that I was going to get shot." On cross-examination, defendant admitted that he did not see anyone else with a gun.

¶ 17    At the close of evidence, the jury was instructed on first degree murder, second degree murder and self-defense. Among other exhibits, the jury received video footage of the shooting.

¶ 18    The jury found defendant guilty of first degree murder and found that he personally discharged a firearm in the commission of the offense that proximately caused another person's death. The court sentenced defendant to 20 years for the murder and an additional 25 years for the discharge of a firearm, for a total sentence of 45 years in prison.

¶ 19    On direct appeal, defendant asserted that the trial court erred in barring evidence of Brock's violent character. *Bahena*, 2012 IL App (1st) 102054-U. We affirmed, reasoning that "any error in the exclusion of such evidence was harmless." *Id.* ¶ 27. In doing so, we noted that the video footage "demonstrated that defendant moved toward Brock as they argued, and defendant shot several times, striking Lebron, who stood between defendant and Brock." *Id.*

---

[1] Sergio's last name is not apparent from the record.

¶ 20     In January 2013, defendant filed a *pro se* post-conviction petition under the Act, which claimed that his trial and appellate counsel were ineffective. The trial court summarily dismissed the petition, and defendant filed a notice of appeal. The Office of the State Appellate Defender moved to withdraw from that appeal pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). On January 30, 2015, this court granted that motion and affirmed the summary dismissal of defendant's petition. *People v. Bahena*, 2015 IL App (1st) 131791-U.

¶ 21     On February 19, 2016, defendant filed a motion for leave to file a successive post-conviction petition, as well as a successive petition for post-conviction relief (the petition). Attached to the petition is a signed and notarized affidavit reflecting that it was executed by Brock on August 15, 2014.[2] In the affidavit, Brock states that he perjured himself at defendant's trial:

> "I admit that I was wrong when I falsely testified against you in court * * *. I will be willing to testify that I lied on you and that it was me who provoked the shooting that got Juan Lebron killed. Even the detective knew I started the trouble they asked me why did we go to that store and when I told them they didn't care."

¶ 22     In the affidavit, Brock states he decided to go to the liquor store "to see if we could catch some of the [S]tones slipping because I just wanted to fight." Brock states:

> "I just thought we had a couple of [S]tones to beat up real quick I wanted to show how tough me and my guys were, but after shorty ran and got y'all and then the clerk in the store had calmed everybody down and you and your guys were leaving out we didn't want y'all waiting outside for us to come out last either

---

[2] Defendant's brief states that he received the affidavit from Brock while his initial post-conviction petition was pending.  However, the date of receipt is not apparent from the record.

what me Jason Brock and Juan did to start the shooting was to front like we had a thumper on us the store camera didn't pick up all of our actions and I testified that I only called my guy to bring a thumper to the store."

¶ 23 Brock further states that he and Lebron "faked like we had a gun that[s] why he said 'f*** that let's shoot these bitches now' * * *. The shooting happened so fast after he said that and I agreed by saying yeah out loud." Brock states: "I should have told the truth about me and [Lebron] starting the trouble with your people and then provoking the shooting incident which got him killed. It never would have happen[ed] if we did not pretend to have a gun."

¶ 24 In the letter affidavit, Brock also states that he lied "because I hated the Stones and wanted to get even for [Lebron's] death." According to Brock, "[t]he [S]tate knew I was l[y]ing about the whole shooting incident that's why they kept having to help me with my story before your trial started." Brock states he is now telling the truth because he is "tired of having all the lies I told on my conscience."

¶ 25 Defendant's petition asserts a claim of "actual innocence of first degree murder" on the basis of newly discovered evidence, *i.e.*, Brock's affidavit. The petition claims that Brock's affidavit supports defendant's "second degree defense that he use[d] at trial, as well as self defense." Defendant asserts that the affidavit is evidence of his actual innocence that would change the outcome of his trial. In addition to the claim of actual innocence, the petition asserts a "*Brady* violation," in that "material exculpatory information [was] withheld from the defense." Specifically, the petition asserts that "the State Attorneys knew [Brock] was l[y]ing about the whole shooting incident" and that "[t]his evidence was concealed from the defense."

¶ 26    On April 11, 2016, the trial court denied defendant's motion for leave to file a successive petition. The court first reasoned that defendant did not raise a colorable claim of actual innocence because the Brock affidavit was not newly discovered evidence in light of his trial testimony. Additionally, the court found that the affidavit was not "material and non-cumulative" or of "such a conclusive character that it would probably change the result on retrial." The court also found that defendant could not otherwise satisfy the "cause-and-prejudice test" to obtain leave to assert a successive petition. The trial court further concluded that defendant's claim of a *Brady* violation failed because it was not based on "material" evidence and because defendant failed to demonstrate "cause" to assert the *Brady* claim in a successive petition.

¶ 27    On appeal, defendant contends that the trial court erred in denying his motion for leave to file a successive postconviction petition with respect to both his actual innocence claim, as well as his *Brady* claim. First, he argues that he stated a colorable actual innocence claim based on the contents of the Brock affidavit. Second, he argues that he established the requisite "cause" and "prejudice" to allow him to assert his claim that the State violated *Brady*.

¶ 28    The Act "provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial" which "is not a substitute for an appeal, but rather, is a collateral attack on a final judgment." *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act provides that "[o]nly one petition may be filed * * * without leave of the court." 725 ILCS 5/122-1(f) (West 2016). Nevertheless, there are "two bases upon which the bar against successive proceedings will be relaxed." *Edwards*, 2012 IL 111711, ¶ 22. "The first basis for relaxing the bar is when a petitioner can establish 'cause and prejudice' for the failure to raise the claim earlier." *Id.* (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). Second, our

supreme court has held that a colorable claim of "actual innocence" will permit a successive postconviction petition. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 40 (citing *Edwards*, 2012 IL 111711, ¶ 23). Thus, in order to file a successive petition, the defendant's petition must satisfy the cause-and-prejudice test or it must state a colorable claim of actual innocence. *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 19. The latter claim is permitted because "a wrongful conviction of an innocent person violates due process." *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009). In this case, defendant first claims he is actually innocent.

¶ 29    "The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial. [Citations.]" *Edwards*, 2012 IL 111711, ¶ 42. When a defendant raises a claim of actual innocence, "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' " *Id.* ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). To this end, "all well-pleaded facts that are not positively rebutted by the trial record are taken as true." *People v. Harper*, 2013 IL App (1st) 102181, ¶ 38. We review a trial court's ruling on a motion for leave to file a successive postconviction petition *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 30    Initially, the State argues that defendant is not raising a *per se* "actual innocence" claim since he does not dispute, as a factual matter, that he shot and killed Lebron. The State suggests that, regardless of whether defendant acted in self-defense, he cannot bring a claim of actual innocence because self-defense merely "results in a *legal* acquittal, which is wholly distinct from factual actual innocence of a crime."

¶ 31    In support of this argument, the State relies largely on principles stated in *People v. Barnslater*, 373 Ill. App. 3d 512 (2007). The *Barnslater* defendant pled guilty to aggravated criminal sexual assault based on the assault being committed during a kidnapping. In a postconviction petition, defendant set forth a claim of actual innocence, relying on an affidavit in which the alleged victim denied that she was held against her will. *Id.* at 515-16. Defendant essentially argued that, since the affidavit "undercut the necessary elements of kidnaping, [*sic*] he is, therefore, 'actually innocent' of aggravated criminal sexual assault." *Id.* at 519. This court rejected that argument, noting the "distinction between being found 'not guilty' and being 'actually innocent' for purposes of postconviction relief." *Id.* We reasoned that "actual innocence" means total vindication or exoneration, and "requires that a defendant be free of liability not only for the crime of conviction, but also of any related offenses. [Citations.]" *Id.* at 520-21. Thus, the affidavit did not support an actual innocence claim because it did not show that defendant was innocent of lesser included offenses. *Id.* at 526-27.

¶ 32    Applying these principles, this court has held that newly discovered evidence did not support an actual innocence claim, to the extent it could merely reduce the defendant's liability from first degree murder to second degree murder. *People v. Wingate*, 2015 IL App (5th) 130189, ¶¶ 31-34. Notably, however, *Wingate* recognized the possibility that new evidence could support an actual innocence claim, to the extent it supported an acquittal on the basis of self-defense. *Id.* ¶ 35 ("To the extent [witness's] proffered testimony could potentially lead to the defendant's complete acquittal, on the basis of self-defense, we conclude that even if we assume *arguendo*, that the testimony would * * * be exonerating to the extent it could support a claim of

actual innocence, that would not assist the defendant in overcoming the infirmities that justify us in affirming the trial court's ruling for the two other independent reasons discussed above.").

¶ 33    In this case, defendant's petition asserts that Brock's affidavit would support either reduction to second degree murder, *or* acquittal based on self-defense. We agree with the State that, consistent with *Barnslater* and *Wingate*, defendant does not set forth a claim of actual innocence, to the extent he suggests that Brock's affidavit could lead to a second degree murder conviction. However, the case law cited by the State does not prevent defendant from asserting an actual innocence claim, under the premise that the "new evidence" in Brock's affidavit could lead to an acquittal based on self-defense.

¶ 34    That said, we turn to the question of whether defendant stated a colorable claim of actual innocence. The requirements for establishing a claim of actual innocence are as follows:

> "[T]he defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [*People v. Washington*, 171 Ill. 2d 475, 489]. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See [*People v. Burrows*, 172 Ill. 2d 169, 180 (1996)]. Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. [*People v. Molstad*, 101 Ill. 2d 128, 135 (1984)]. And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [*People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009)]." *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 35    The parties dispute whether the Brock affidavit satisfies each of these elements. However, we need not discuss them all in order to affirm the circuit court. Even assuming *arguendo* that the Brock affidavit is newly discovered, material, and noncumulative, we cannot conclude that it is of such conclusive character that it would probably change the result on retrial. See *People v. Sanders*, 2016 IL 118123, ¶ 47 (stating that "the conclusiveness of the new evidence is the most important element of an actual innocence claim"). Stated differently, given the other evidence in this case, we do not find it probable that a jury would acquit defendant on the basis of self-defense, even if Brock testified consistently with his affidavit.

¶ 36    Here, the contents of Brock's affidavit are not significantly different from the evidence adduced at trial. In this respect, we note that the jury already heard evidence that at least arguably supported a claim of self-defense. Camacho testified that he heard Brock threaten defendant's gang and that Brock asked someone to bring a gun. Brock admitted that he yelled "LaFamilia Stone Killer" and that he called a friend to request a gun. Furthermore, the jury heard defendant's own testimony that he acted in self-defense. Defendant testified that he saw Brock reaching for his waist and that he fired because he was "in fear for my life that I was going to get shot." Thus, the jury already heard but rejected his self-defense claim.

¶ 37    We acknowledge that Brock's affidavit adds certain assertions that were not testified to at trial. Specifically, in the affidavit, Brock states that he and Lebron "faked like we had a gun." The affidavit also claims that Lebron said "f*** that let's shoot these bitches now" and that Brock "agreed by saying yeah out loud." However, these statements are not materially different from the evidence the jury already considered before convicting defendant. In other words, the new statements in the affidavit do not "raise the probability that it is more likely than not that no

reasonable juror would have convicted him in the light of the new evidence." *Edwards*, 2012 IL 111711, ¶ 33; see also *People v. Evans*, 2017 IL App (1st) 143268, ¶ 30 ("An actual innocence claim does not merely challenge the strength of the State's case against the defendant.").

¶ 38    More importantly, any potential effect of Brock's affidavit in support of a self-defense argument is countered by the impact of the video footage admitted at trial, which this court has reviewed. The video shows Lebron restraining Brock when Brock removes his coat and moves towards defendant's group. Shortly thereafter, defendant rapidly moves toward Brock, as Lebron stands between defendant and Brock. Defendant and Lebron's arms come into contact. Defendant then pushes off Lebron and steps back before drawing a gun and firing.

¶ 39    We recognize that Brock's affidavit claims that the video store camera "didn't pick up all of [Brock's and Lebron's] actions" and that there is no audio on the video footage. Nonetheless, it is quite apparent that defendant escalated the confrontation by pursuing Brock (who was shielded by Lebron) before raising his gun and firing five shots. Further, it is undisputed that no one besides defendant had a weapon. Given this evidence, there is no reasonable probability that a jury would reach a different result on retrial, even if it heard testimony consistent with Brock's affidavit. *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36 ("the evidence must be so conclusive that it would probably change the result on retrial"); see also *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008) ("[T]he hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.' "). We thus conclude that defendant did not raise a colorable claim of actual innocence. In turn, the trial court correctly denied defendant's motion for leave to assert a successive postconviction petition, to the extent it was premised on an actual innocence claim.

¶ 40 We next consider defendant's alternative argument: that the court erred in denying him leave to file the successive petition because he established "cause and prejudice" with respect to his claimed *Brady* violation premised upon the Brock affidavit. For the following reasons, we reject that argument.

¶ 41 Defendant must establish both cause and prejudice in order to obtain leave to assert a *Brady* claim in a successive postconviction petition. *People v. Thompson*, 383 Ill. App. 3d 924, 929 (2008) ("It is the defendant's burden to demonstrate both cause and prejudice for each claim raised in his successive petition."). The Act provides that "(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2018).

¶ 42 Here, the trial court found that defendant did not demonstrate "cause" for failing to include the *Brady* claim in his initial postconviction petition. That said, we need not discuss cause to affirm. See *People v. Thompson*, 383 Ill. App. 3d 924, 929 (2008) (in reviewing trial court's decision on whether to grant leave to file a successive postconviction petition, "our decision is not dependent upon the trial court's reasoning."). In this case, it is apparent that defendant cannot establish prejudice from the State's purported *Brady* violation, because his *Brady* claim is clearly without merit.

¶ 43 "Under *Brady*, the State must disclose evidence favorable to the accused and material either to guilt or to punishment." *People v. Jarrett*, 399 Ill. App. 3d 715, 727 (2010) (Internal

quotation marks omitted.). "A *Brady* claim requires a showing that (1) the undisclosed evidence is favorable to the accused * * *; (2) the evidence was suppressed by the State * * *; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. [Citations.] Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. [Citations.]" *Id.* at 728.

¶ 44   In this case, the purported exculpatory evidence referenced in the Brock affidavit cannot be considered "material." As discussed with respect to defendant's actual innocence claim, we do not find any reasonable probability that the result of the proceeding would have been different, even if the jury heard testimony consistent with the Brock affidavit. In turn, defendant cannot meet the materiality requirement of a *Brady* claim. *See People v. Green*, 2012 IL App (4th) 101034, ¶ 40 ("even if defendant's claim were new, defendant could not meet the *Brady* materiality test because, as we explained in rejecting defendant's claim of actual innocence, no reasonable probability exists that the result of his trial would have been different.").

¶ 45   As the evidence purportedly withheld is not material, the *Brady* claim was without merit. In turn, defendant cannot show the requisite prejudice to bring a successive postconviction petition. In other words, defendant cannot demonstrate that the alleged *Brady* violation "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016). Accordingly, the trial court correctly denied defendant leave to file a successive postconviction petition, to the extent it was premised on the alleged *Brady* violation.

¶ 46   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47   Affirmed.