2020 IL App (1st) 190690-U

No. 1-19-0690

Second Division
November 10, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 11 CR 3722 |
| v. | ) | |
| | ) | |
| KYJUANZI HARRIS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant.[1] | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The second-stage dismissal of defendant's amended postconviction petition is affirmed where the petition established a substantial showing of neither actual innocence nor ineffective assistance of appellate counsel.

_____

[1] Defendant's notice of appeal contains a typographical error whereby the appellee is listed as "THE PEOPLE FO THE STATE OF ILLINOIS." We adopt the correct caption here.

¶ 2    Defendant Kyjuanzi Harris appeals from an order of the trial court granting the State's motion to dismiss his petition for postconviction relief at the second stage. Defendant argues that his petition should have advanced to a third-stage evidentiary hearing based on various theories of ineffective assistance of appellate counsel and a claim of actual innocence based on newly discovered evidence in the form of statements from two witnesses. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    The facts are more fully described in this court's order affirming defendant's conviction on direct appeal. *People v. Harris*, 2016 IL App (1st) 141206-U. We recount the facts here to the extent they are relevant to the issues on appeal.

¶ 5                              A. Pretrial Motions

¶ 6    In March 2011, defendant was indicted on charges of first degree murder arising from the May 2009 shooting deaths of Bernadette Turner and Derrick Armstrong. Defendant retained private trial counsel, who filed pretrial motions to quash defendant's arrest and to suppress the pretrial identifications made by the State's two eyewitnesses. After hearings on each motion, both were denied by the trial court.

¶ 7    Trial counsel also filed a pretrial motion to declare Debra Hardy, one of the State's eyewitnesses, incompetent to testify at trial based on a history of substance abuse and multiple psychiatric diagnoses, including paranoid schizophrenia. Counsel obtained a report from a hired expert opining that Hardy was "an individual with low intelligence" who exhibited "memory deficits" and "the inability to distinguish reality from fantasy or imagined events." However, after a hearing and a *voir dire* of Hardy, the trial court found Hardy competent to testify.

¶ 8                                  B. Trial

¶ 9     Defendant's jury trial began in December 2012. Tamira Smith testified that on May 21, 2009, she was with Turner and Armstrong at Horan Park in Chicago. The three sat in Armstrong's parked car with Armstrong in the driver's seat, Turner in the front passenger's seat, and Smith behind Turner. At around 9:15 p.m., a black vehicle pulled up on the passenger's side of Armstrong's car, about three feet away. In court, Smith identified defendant, whom she did not know, as the driver and sole occupant of the black vehicle. She testified that she saw defendant's dreadlocks and face, including his eyes and "[l]ight-skinned" complexion. There was street lighting, and Smith had an unobstructed view of defendant's face for "five or ten seconds." Defendant then stuck a gun out of the driver's-side window with his left hand and fired approximately eight shots into Armstrong's car. Smith "ducked down" when defendant started shooting and did not sit back up until he drove away.

¶ 10    On November 8, 2010, Smith identified defendant as the shooter in a photo array at the police station. She returned to the police station on February 11, 2011 and identified defendant in an in-person lineup.

¶ 11    Hardy testified that she was currently serving a 2½-year prison sentence for possession of a controlled substance. She also acknowledged that she had a 2006 conviction for possession of a controlled substance and had served 20 years in prison for a 1984 murder conviction.

¶ 12    Hardy arrived at Horan Park around 5 p.m. on the day of the shooting. Turner and Armstrong were sitting in Armstrong's car, which was parked "directly in front of her." Hardy initially stated that she was "a couple inches" from their car, but later testified that she was sitting on a bench about 20 feet away. At approximately 9:30 p.m., defendant, whom Hardy knew from

previous drug transactions,[2] drove up next to Armstrong's car and fired "a lot of shots" at Turner and Armstrong. Hardy initially testified that she could "[p]artially" see defendant's face, but later stated that she saw his "whole face" and that he was not wearing anything to cover his face. She did not recall how long she viewed defendant's face.

¶ 13    After the shooting, Hardy followed the ambulance to the hospital. There, she told Turner's mother that she knew who the shooter was but would not give his name "because she saw him open fire on a car and kill two people that [she] knew." Hardy did not talk to the police about the shooting until June 6, 2009, when detectives found her on the street. She agreed to talk to them and told them that defendant was the shooter. On December 9, 2010, Hardy went to the police station and again told detectives that defendant was the shooter. She also identified defendant from a photo array on that day.

¶ 14    On cross-examination, Hardy acknowledged that she was snorting heroin daily around the time of the shooting. She also admitted to being diagnosed with "various psychiatric disorders," including paranoid schizophrenia. She was not taking any medication for these disorders at the time of the shooting. The trial court sustained objections to trial counsel's attempts to question Hardy about psychological and drug evaluations that she received while incarcerated.

¶ 15    Detective David Roberts testified that he responded to the crime scene at approximately 10 p.m. on May 21, 2009. He walked through the scene and identified 11 shell casings and a fired bullet. Forensic investigators marked, photographed, and inventoried the shell casings and bullet. In court, Roberts identified photographs of each shell casing next to its respective forensic marker.

_____

[2] Per the court's pretrial ruling, the court instructed the jury to consider the statement only to explain the basis for Hardy's identification and not for any other purpose.

¶ 16 Roberts further testified that he spoke to Smith at the police station on the night of the shooting. Smith told him that she witnessed the murders and described the shooter as a black man in his 20s with a "medium complexion" and "short twists in his hair." Smith did not say that the shooter's face was partially covered.

¶ 17 On June 5, 2009, Roberts and another detective went to the home of Turner's mother. She told the detectives that Hardy had told her at the hospital that she knew who the shooter was but would not give his name. Roberts eventually found Hardy on the street and interviewed her, but he was unable to ascertain the shooter's identity. Roberts testified that Hardy did not tell him that defendant was the shooter or that she saw a passenger in the backseat of Armstrong's car during this conversation.

¶ 18 On November 2, 2010, Roberts received an anonymous tip over the telephone that led him to compile a photo array that included defendant's photograph. He then showed the photographs to Smith, who identified defendant as the shooter. Smith also later identified defendant in a physical lineup.

¶ 19 Roberts further testified that he had a second interview with Hardy on December 9, 2010. According to Roberts, it was during this interview that Hardy told him for the first time that defendant was the shooter. Hardy also identified defendant from the photo array.

¶ 20 Tracy Konior, a forensic scientist for the Illinois State Police, testified as an expert in the field of firearm identification. She examined the 11 shell casings found at the scene and determined that they were all fired from the same gun. Konior also examined a total of 10 fired bullets recovered from the scene and the victims' bodies and determined that all 10 were fired from the same gun as each other. She could not definitively say whether the gun that fired the shell casings was the same gun that fired the bullets.

¶ 21    Forensic scientist Eleanor Giacometti testified as an expert in the field of fingerprint examination. Giacometti performed a series of tests on the shell casings found at the scene and determined that there were no prints suitable for comparison. She explained that it was "extremely rare" to find a usable print on a fired shell casing.

¶ 22    The State rested. The court asked defendant whether he wanted to testify, and defendant responded that he did not. The defense then rested without presenting evidence. After closing arguments and deliberations, the jury found defendant guilty of the first degree murders of both victims.

¶ 23                    C. *Krankel* Hearing

¶ 24    In January 2013, the court held a hearing on trial counsel's motion to withdraw based on a complaint that defendant filed against him with the Illinois Attorney Registration and Disciplinary Commission (ARDC). Although the ARDC informed trial counsel that "no action was warranted," counsel moved to withdraw because he felt defendant's allegations "created some kind of issue for his continued representation." The trial court obtained defendant's letter to the ARDC and determined that it warranted a hearing on defendant's claims of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 25    At the *Krankel* hearing, defendant argued that trial counsel was ineffective for recommending that he elect a jury trial and that he not testify. Defendant also challenged counsel's decision not to present a defense, explaining that counsel "said that it [would] be good on our behalf that he didn't put my alibi witnesses on the stand because we was [*sic*] winning." Finally, defendant complained that counsel did not visit him in custody and "didn't object to when Debra Hardy was on the stand" or "when Tamara Smith was laughing on the stand."

¶ 26    In response, trial counsel explained that he "made a careful determination that those alibi witnesses would not be beneficial" because he felt that reasonable doubt had been established "given the inconsistencies between the two eyewitnesses and other evidence that had been brought out in the State's case and on cross-examination." Counsel also stated that he interviewed the witnesses and ensured that they were available to testify, but ultimately "made a strategic decision not to call those witnesses because [he] felt that they would not be believed by the jury and [the defense] would be in danger of damaging a lot of the reasonable doubt that [they] had established." Counsel further explained that he suggested that defendant not testify because he would be impeached with his previous felony convictions and that defendant elect a jury trial because a judge was more likely to find two eyewitnesses sufficient for a conviction. Finally, counsel testified that he did not visit defendant when he was originally held in De Witt County, which was three and half hours away. However, the court granted counsel's pretrial motion to transfer defendant to Chicago, where counsel was able to meet with him and "go through the things that we were going to be raising at trial."

¶ 27    The court denied defendant's *Krankel* motion, opining that defendant was "extremely aggressively represented by a dedicated lawyer" who "tried as hard as he possibly could" and "did the best with what he had." The court further stated:

> "The fact is there were two people that identified Mr. Harris as the shooter in this case, that was responsible for two murders. The jury heard them, they came into court with the baggage they did, they were explored totally, the fact that a lawyer made a strategic [decision] not to put on alibi witnesses because he had no confidence that they would be believed; as a matter of fact, he thought it would make the situation worse, speaks for itself."

¶ 28    The court also granted trial counsel's motion to withdraw and gave defendant a continuance to hire a different private counsel. When defendant was unable to do so, the court appointed a public defender to represent him. Through the public defender, defendant filed a motion for a new trial, which was denied. After a sentencing hearing, the court imposed a mandatory sentence of natural life in prison.

¶ 29                                    D. Direct Appeal

¶ 30    Defendant took a direct appeal, arguing that the trial court erred in (1) limiting the defense's ability to cross-examine Hardy about her psychiatric history, (2) allowing Hardy to testify that she knew defendant because they used to sell drugs together, (3) allowing the State to make improper comments in closing argument, (4) failing to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b), and (5) making an inadequate *Krankel* inquiry into defendant's claim that trial counsel was ineffective for failing to call alibi witnesses. *Harris*, 2016 IL App (1st) 141206-U, ¶ 2. We affirmed, finding no error in the trial court's evidentiary rulings, the State's closing argument, or the *Krankel* inquiry. *Id.* ¶ 1. Although we found that the trial court's admonishments did not comply with Rule 431(b), we concluded that the error did not rise to the level of plain error because the evidence was not closely balanced. *Id.* ¶ 117.

¶ 31                           E. Original Postconviction Petition

¶ 32    On August 20, 2018, defendant filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The petition alleged various theories of ineffective assistance of trial counsel and a claim of actual innocence based on newly discovered evidence in the form of statements from Hardy and Donathon Williams.

¶ 33                              1. The Hardy Materials

¶ 34   Numerous documents were attached to the petition. The first such document was a handwritten statement from Antoine Feemster, the defense's private investigator, that recounted a conversation between he and Hardy on August 17, 2018. According to Feemster's statement, Hardy stated that "two homicide detectives grabbed her off the street and told her she was wanted for questioning for a murder along with Kyjuanzi Harris." Although Hardy "didn't know anything about" the murder, the detectives planted drugs on her and forced her to falsely testify that defendant was the offender. Hardy knew that her nephew, Dennis Glover, was the real shooter but nevertheless testified that it was defendant because she was "scared for [her] life" and "did not want to spend 50 years in the penitentiary." Feemster's handwritten statement was signed by Hardy but not notarized.

¶ 35   Defendant also attached an "Affidavit of Antoine Feemster" in which Feemster stated that he spoke to Hardy on August 17, 2018 and "obtained a recorded and written statement." Feemster wrote out what Hardy told him, and she then "carefully reviewed the statement and signed." The "affidavit" was signed by Feemster and included the following passage:

> "Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to mattes therein stated to be on information and belief and as such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true."

The document was not notarized.

¶ 36                                                2. The Williams Materials

¶ 37   The petition was additionally accompanied by two documents entitled "Affidavit of Donath[o]n Williams." In the first document, Williams states that he and Dennis Glover were in

Glover's car on November 12, 2013, when Williams noticed that Glover was carrying a gun. Glover told Williams that he (Glover) was "like that," which Williams explained was "street for killer." Glover further stated that Williams had "heard about some of [his] work" in that he killed "ole boy" and "that bitch." The second "affidavit," Williams clarifies that "ole boy" and "that bitch" referred to Armstrong and Turner, respectively. Both documents were signed by Williams and contained the same section 1-109 paragraph as Feemster's statement, but neither was notarized.

¶ 38                                    3. The Mroz Materials

¶ 39    The final four documents attached to the petition were from Martin Mroz, another private investigator for the defense. The first document is entitled "Affidavit of Martin Mroz" and contains the same section 1-109 language as described above. In the "affidavit," Mroz states that he dictated Williams' "affidavits" after speaking to him on August 16, 2018. The document is signed but not notarized.

¶ 40    The second Mroz document is another purported "affidavit" in which Mroz states that he took statements from Derrick Sylvester and Yvette Harris based on telephone conversations with them on February 13, 2018. The document is signed by Mroz and includes the section 1-109 language, but is not notarized

¶ 41    The last two documents are purportedly the typed transcripts of the telephone conversations, which were prepared by Mroz. According to one transcript, Derrick Sylvester stated that he went to the home of Yvette, who is defendant's aunt, at about 7:30 p.m. on the day of the murders. There, he, Yvette, defendant, and defendant's sister Kyauna Sylvester "sat around, ate dinner, cracked jokes, reminisced about family and old times." Derrick Sylvester further stated he

"probably remember[ed]" a private investigator calling him about defendant, but he did not remember giving a statement because "it's been so many years, so much time has passed."

¶ 42 According to the transcript of Mroz's conversation with Yvette, Yvette left work around 5 p.m. on the day of the murders and picked up her friends Aquinetta and Kyuana Sylvester. They then picked up defendant and went back to Yvette's house. Derrick Sylvester also "stopped by for a little while." Defendant spent the entire night at Yvette's house and did not leave until she drove him home the next morning. Yvette stated that she never spoke to a private investigator and was forced to stay outside of the courtroom for all three days of trial "because they told me that I was a witness."

¶ 43                                    F. State's Motion to Dismiss

¶ 44 The State filed a motion to dismiss defendant's petition, arguing that his ineffective assistance claims were barred by the doctrines of *res judicata* and law of the case. The State also contended that defendant's claim of actual innocence failed because, *inter alia*, the signatures of the defense's private investigators "fail[ed] to substitute for notarization" and the petition "provide[d] no independent individual(s) not connected to the instant matter to verify that Debra Hardy or Donetha [*sic*] Williams, in fact, averred [their] statements."

¶ 45                                    G. Defendant's Amended Petition

¶ 46 Defendant subsequently filed an amended postconviction petition, again asserting actual innocence based on the information from Hardy and Williams. Defendant now characterized his challenges to trial counsel's conduct as claims of ineffective assistance of appellate counsel for failing to assert ineffective assistance of trial counsel on direct appeal. Specifically, defendant contended that appellate counsel provided ineffective assistance by failing to argue that trial counsel was ineffective for (1) failing to investigate Yvette and Derrick Sylvester as alibi

witnesses, (2) "abandoning" the defense by failing to present any evidence, and (3) failing to make a stipulation regarding the shell casings from the scene rather than allowing the State's witnesses to "testify *ad nauseum* about procedural investigative matters involving each specific step used in placing each shell casing into evidence."

¶ 47                                    H. Materials Attached to the Amended Petition

¶ 48    Defendant again attached the handwritten statement from Feemster detailing a conversation with Hardy on August 17, 2018. The statement remained signed by Hardy, but unnotarized. However, defendant also attached a properly signed and notarized affidavit from Hardy in which she averred that "[t]he statements contained in the August 17, 2018, written statement along with the audio I provided to MSI Detective Services private investigator Antoine Feemster was provided on my free will and I was not threatened to provide them." Hardy further averred that she was "willing and able to provide further sworn testimony should Kyjuanzi Harris' post-conviction petition proceed to hearing or trial." The amended petition was also now accompanied by a flash drive containing the audio recording of the conversation between Feemster and Hardy. The recording is consistent with Feemster's handwritten summary.

¶ 49    Defendant also attached Williams' "affidavits," which were signed and included the section 1-109 language but remained unnotarized.

¶ 50    Defendant also attached the unnotarized "affidavits" from Mroz and the transcripts of Mroz's telephonic conversations with Yvette and Derrick Sylvester.

¶ 51    Finally, defendant attached a signed and notarized affidavit in which he averred that he was unaware of the new information from Hardy and Williams until those witnesses spoke to his private investigators in August 2018.

¶ 52                                    I. State's Motion to Dismiss the Amended Petition

- 12 -

¶ 53    The State moved to dismiss the amended petition, essentially repeating the arguments it raised in moving to dismiss the original petition. The court took the matter under advisement after listening to arguments at a hearing on January 22, 2019.

¶ 54    On February 27, 2019, the court issued a written order granting the State's motion to dismiss defendant's amended petition. In so ruling, the court stated that defendant's claims of ineffective assistance of counsel were all procedurally barred because they were matters of record that could have been raised on direct appeal. The court also found that the claim that trial counsel failed to investigate alibi witnesses was "directly rebutted by the record" and the other issues were matters of trial strategy that could not support an ineffective assistance claim.

¶ 55    As for the claim of actual innocence, the court found defendant's materials to be insufficient because neither Williams nor Hardy claimed to have any firsthand knowledge of the murders. The court also noted that defendant failed to attach a notarized affidavit from Glover and, although Hardy's affidavit was properly notarized, it did not make any reference to the substance of her conversation with Feemster.

¶ 56    This appeal followed.

¶ 57                                    II. ANALYSIS

¶ 58                                  A. Motion to Strike

¶ 59    As a preliminary matter, we first address the State's motion to strike the following portions of defendant's reply brief on appeal:

   (1) a reference that defendant was arrested pursuant to a so-called "investigative alert" and an accompanying footnote explaining that this court found the Chicago Police Department's use of the investigative alert system unconstitutional in *People v. Bass*, 2019 IL App (1st) 160640, and

(2) a paragraph stating the Joseph Lattanzio, the assistant state's attorney who prosecuted defendant, was fired in 2015 by then-State's Attorney Anita Alvarez for providing a false statement under oath in an unrelated case.

¶ 60    Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) provides that "[p]oints not argued [in an opening brief] are forfeited and shall not be raised in the reply brief." The reply brief also "shall be confined strictly to replying to arguments presented in the brief of the appellee." Ill. S. Ct. R. 341(j) (eff. May 25, 2018). Similarly, a defendant cannot raise issues for the first time on appeal that were not argued in the postconviction petition. *People v. Jones*, 213 Ill. 2d 498, 506-08 (2004).

¶ 61    Although defendant challenged the legality of his arrest in a pre-trial motion (albeit before *Bass* was decided), he did not include the matter in his direct appeal, either of his postconviction petitions, or in his opening brief in this appeal, which was filed after *Bass*. Defendant acknowledges that he did not cite *Bass* in his opening brief, but argues that we should nevertheless "consider its effect on the overall constitutional due process violations committed against [him]." However, defendant has forfeited the investigate alert issue by failing to raise the matter in either of his postconviction petitions or in his opening brief. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 23 (observing that our supreme court has "repeatedly held an appellant's failure to argue a point in the opening brief results in forfeiture under Supreme Court Rule 341(h)(7)"). We also note that, in any event, the circumstances of defendant's arrest are completely irrelevant to the issues raised in defendant's amended petition and on appeal. Thus, we would resolve the issues on appeal in the same way regardless of how we ruled on the State's motion to strike.

¶ 62    As for the Lattanzio paragraph, we note that defendant did include the fact of Lattanzio's firing in a footnote in the opening brief. However, defendant raised no argument about that information in the opening brief, nor did he include the matter in either of his postconviction petitions, which were both filed well after the firing. As such, this point is also forfeited. *Jones*, 213 Ill. 2d at 506-08.

¶ 63    Nevertheless, defendant argues that he "had to include Lattanzio's history in his reply as it was required to fully respond to [the State's] arguments supporting the lower court's opinion." Specifically, because defendant contends that the trial court dismissed his petition because it found Hardy's recantation not credible, he argues that "Lattanzio's credibility as the prosecuting attorney is responsive to the argument that Hardy herself is incredible."

¶ 64    First, even if the trial court or the State based its position on an assessment of Hardy's credibility, we would ignore that argument because courts must not make credibility determinations at the second stage of postconviction proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 42. Second, we fail to see how defendant's reply brief is responsive where he raises no claim of any wrongdoing by Lattanzio in this case. Although Hardy contends that she was forced to testify falsely, her accusation is against unnamed Chicago homicide detectives, not Lattanzio. Indeed, it is unclear from the record whether Lattanzio and Hardy even had any interaction before trial. Although Hardy testified, in a direct examination conducted by Lattanzio, that she believed "a State's Attorney" might have been present for one of her interviews with detectives, she immediately clarified that she did not remember who was present apart from Roberts. In his testimony, both at trial and a pretrial suppression hearing, Roberts mentioned only that he and his partner were present for those interviews. Again, even if Lattanzio were more involved in the

investigation, we would still find references to his conduct in an unrelated case irrelevant and forfeited where the conduct was not raised in the postconviction petition.

¶ 65   Consequently, we grant the State's motion to strike portions of defendant's reply brief.

¶ 66                    B. The Postconviction Hearing Act

¶ 67   We now turn to defendant's contention that he is entitled to an evidentiary hearing under the Act. The Act provides a three-stage procedural mechanism by which criminal defendants may seek relief based on alleged violations of their constitutional rights. *People v. Edwards*, 2012 IL 111711, ¶ 21. At the first stage of proceedings, a trial court may summarily dismiss a defendant's petition only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *People v. Domagala*, 2013 IL 113688, ¶ 32. If, as here, the petition advances to the second stage, the defendant bears the higher burden of making a "substantial showing" of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35. At the second stage, the court must liberally construe the record in the defendant's favor and accept all well-pleaded facts in the petition and accompanying affidavits as true unless such facts are positively rebutted by the trial record. *People v. Brown*, 2020 IL App (1st) 170980, ¶ 41. Where the trial court dismisses a petition without holding an evidentiary hearing, our review is *de novo*, and we may affirm the trial court's decision on any basis found in the record. *People v. Begay*, 2018 IL App (1st) 150446, ¶¶ 34-35.

¶ 68                         B. Actual Innocence

¶ 69   We first consider whether defendant's petition and the attached materials raised a substantial showing of actual innocence. To succeed on a claim of actual innocence , a defendant must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) so conclusive in nature that it would probably change the result on retrial. *People v. Allen*, 2015 IL 113135, ¶ 22. Newly discovered evidence is that which is "discovered after trial and could not

have been discovered earlier through the exercise of due diligence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material and noncumulative if it significantly advances the defendant's claim of innocence and adds to what the jury heard at trial. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 33. Evidence is sufficiently conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence offered by the defendant. *People v. Sanders*, 2016 IL 118123, ¶ 53

¶ 70     The parties disagree about which evidence we may consider in determining whether defendant has made a substantial showing of actual innocence. The State argues that we should disregard all of the substantive statements purportedly made by Hardy and Williams because they are unnotarized and therefore not in compliance with section 122-2 of the Act. See 725 ILCS 5/122-2 (West 2018) (providing that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations"). Defendant contends that the materials attached to the petition are sufficiently reliable for us to consider either as affidavits or as "other evidence" within the meaning of section 122-2.

¶ 71     The purpose of the affidavit requirement in section 122-2 is twofold: (1) to present a factual basis that the petition's allegations are capable of objective corroboration, and (2) to "identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *Allen*, 2015 IL 113135, ¶ 32. To qualify as an affidavit, a witness' statement must be sworn to before a person who has the authority under the law to administer oaths. *Id.* ¶ 31. "An affidavit that is not sworn is a nullity." *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 98 (citing *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 497 (2002)). Stated another way, "[a]ffidavits filed pursuant to the Act must be notarized to be valid." (Internal quotation marks omitted.) *People v. Nitz*, 2011 IL App (2d) 100031, ¶ 11. Where a defendant does not support the

allegations in his petition with a properly notarized affidavit, the court may dismiss the petition at the second stage of postconviction proceedings. *Allen*, 2015 IL 113135, ¶ 35.

¶ 72                                   1. The Williams Materials

¶ 73    We first address Williams' statements claiming that Glover confessed to the murders. The State argues that we should not consider these statements because they are unnotarized and thus not affidavits for purposes of section 122-2. We agree. Although the statements contain the section 1-109 verification, such language is not a substitution for proper notarization under the Act. *People v. Turner*, 2012 IL App (2d) 100819, ¶ 25 ("The affidavit's lack of notarization was not cured by certification under section 1-109 of the Code, and thus the affidavit was not proper under the Act.").

¶ 74    Defendant acknowledges that he failed to provide any notarized statements from Williams, but nevertheless argues that we should consider the unnotarized allegations out of fundamental fairness. In so arguing, defendant relies exclusively on the special concurrence in *People v. Johnson*, 2019 IL App (1st) 153204, ¶ 59, where Justice Hyman stated that "we have a duty to avoid rigid and unreasonable adherence to formalism to the detriment of fairness." (Internal quotation marks omitted.). However, *Johnson* is inapplicable to present case. There, the defendant sought leave to file an amended successive postconviction petition based on trial counsel's failure to investigate an eyewitness who could have testified that the defendant was not the offender. *Id.* ¶ 30. The main question on appeal was whether the defendant could satisfy the cause and prejudice test where he was admittedly aware of the eyewitnesses' identity prior to the filing of his initial postconviction petition. *Id.* ¶ 34. Here, in contrast, the issue is whether defendant submitted sufficient materials to establish a substantial showing of a constitutional violation. Moreover, unlike in the present case, the defendant in *Johnson* supported his underlying claim with properly

signed and notarized affidavits from himself, the eyewitness, and trial counsel. *Id.* ¶¶ 26, 28. Thus, *Johnson* does not stand for the proposition that we may ignore the affidavit requirement with respect to Williams' statements.

¶ 75 Instead, we follow *Velasco*, 2018 IL App (1st) 161683, ¶¶ 99-106, where this court declined to consider unnotarized recantation statements from two trial witnesses. In that case, we rejected the defendant's arguments that the unnotarized statements could be considered as "other evidence" under section 122-2 of the Act, and instead explained that our supreme court has plainly held that a lack of notarization is fatal at the second stage of postconviction proceedings. *Id.* ¶¶ 100-104 (citing *Allen*, 2015 IL 113135, ¶ 35). Here, Williams' statements are unnotarized, and we therefore will not consider them.

¶ 76                                    2. The Hardy Materials

¶ 77 We now address Hardy's unnotarized statement, as memorialized in Feemster's handwritten summary, that detectives planted drugs on her and forced her to falsely implicate defendant. Initially, we note that the State concedes that it forfeited the argument that Hardy's statement was unnotarized by failing to raise the issue in its motion to dismiss. Even so, the State urges us to excuse its forfeiture because "it is clear from the record that [defendant] was fully put on notice that lack of notarization was an issue in this case and, further, that [defendant] had ample opportunity to put his documents in compliance with the [Act]."

¶ 78 We agree with the State, and will therefore entertain its forfeiture argument. See *People v. Holmes*, 2016 IL App (1st) 132257, ¶ 65 ("[F]orfeiture is a limitation on the parties and not the reviewing court."). The record shows that both the State's motion to dismiss the original petition and the State's motion to dismiss the amended petition argued that the signature of defendant's private investigators "fail[ed] to substitute for notarization." The motion to dismiss the original

petition also specifically stated that dismissal was proper because defendant "provide[d] no independent individual(s) not connected to the instant matter to verify that Debra Hardy or Donetha [*sic*] Williams, in fact, averred such statements." Thus, defendant was clearly on notice about the lack of notarization, which is further evidenced by the fact that he attached new, properly notarized affidavits from himself and Hardy to his amended petition. In any event, defendant has not challenged the State's forfeiture on appeal and has therefore forfeited any forfeiture argument. *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 77.

¶ 79    Turning to the sufficiency of the Hardy materials, we note that defendant was able to obtain a properly notarized affidavit from Hardy. However, that affidavit states only that Hady voluntarily provided a written statement and audio recording to Feemster on August 17, 2018, and that she would be willing and able to provide further sworn testimony at an evidentiary hearing or retrial. Notably, the affidavit does not make any reference to the substance of her statements to Feemster or what she could further testify to. Instead, the only evidence of the substance of the conversation with Feemster is the handwritten summary prepared by Feemster himself. However, like Williams' statements, the summary is unnotarized and we therefore cannot consider it. *Allen*, 2015 IL 113135, ¶ 35.

¶ 80    Defendant also argues that, although the summary of the Hardy-Feemster conversation is unnotarized, we nevertheless should consider the audio recording of the conversation as "other evidence" within the meaning of section 122-2. We reject this attempt to circumvent the affidavit requirement in section 122-2. In *Allen*, 2015 IL 113135, ¶ 34, our supreme court held that unnotarized statements could qualify as "other evidence" under section 122-2 for purposes of the first stage of postconviction proceedings, in part because defendants typically file their initial petitions without the assistance of counsel. However, the court went on to explain that this

interpretation did not render the affidavit requirement superfluous because a lack of notarization remained a basis for dismissal at the second stage, where defendants must satisfy a higher burden and are afforded the assistance of postconviction counsel to properly present their claims. *Id.* ¶¶ 35-36. Here, defendant's appeal was taken from dismissal at the second stage, and thus we cannot excuse the lack of notarization. *Velasco*, 2018 IL App (1st) 161683, ¶¶ 103-04.

¶ 81     As defendant has largely not supported his claim of actual innocence with valid affidavits, we cannot say that he has made a substantial showing of his innocence. Therefore, the trial court did not err in dismissing his petition on this basis. Because we reach this conclusion, we need not reach the parties' other arguments regarding the Hardy and Williams materials.

¶ 82                                              3. Remedy

¶ 83     As a final matter on the issue, we note that defendant's reply brief suggests that the trial court erred in dismissing the amended petition rather than allowing defendant an opportunity to remedy the lack of notarization. However, as defendant did not argue he should be allowed to remedy his petition in either the trial court or his opening brief on appeal, he has forfeited the issue. *People v. Clark*, 2014 IL App (1st) 130222, ¶ 24 ("[P]oints that are not argued in the opening brief are waived and shall not be raised in defendant's reply brief."). In any event, as previously explained, it is within the trial court's discretion to dismiss a petition at the second stage for lack of notarization. *Allen*, 2015 IL 113135, ¶ 35. Defendant's argument also ignores the general principle that "[i]n the ordinary case, a trial court ruling upon a motion to dismiss a postconviction petition which is not supported by affidavits or other documents may reasonably presume that postconviction counsel made a concerted effort to obtain affidavits in support of the postconviction claims, but was unable to do so." *People v. Johnson*, 154 Ill. 2d 227, 241 (1993). This is especially so here, as after the State attacked the original petition for lack of notarization, postconviction

counsel filed an amended petition that remedied some, but not all, of the procedural defects related to notarization. Accordingly, we cannot say that the trial court erred in dismissing defendant's actual innocence claim for lack of supporting affidavits.

¶ 84                          C. Ineffective Assistance of Appellate Counsel

¶ 85    We now turn to defendant's claims of ineffective assistance of appellate counsel. When evaluating a claim of ineffective assistance of counsel, a reviewing court applies the familiar two-prong test under which the defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness and (2) he suffered prejudice as a result. *Brown*, 2020 IL App (1st) 170980, ¶ 42 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish deficient performance, a defendant must generally overcome the strong presumption that counsel's actions were the product of sound strategy, as strategic choices are "virtually unchallengeable" through an ineffective assistance claim. *People v. Evans*, 2017 IL App (1st) 143268, ¶ 46. Prejudice is established where there is a reasonable probability that  the result of the proceeding would have been different but for counsel's errors. *Brown*, 2020 IL App (1st) 170980, ¶ 42.

¶ 86    Where, as here, the defendant contends that appellate counsel was ineffective for failing to challenge the ineffectiveness of trial counsel, the focus is on conduct of trial counsel and whether an ineffective assistance claim would have prevailed on direct appeal. *People v. Childress*, 191 Ill. 2d 168, 75 (2000). If the underlying claim is meritless, the defendant did not suffer prejudice from appellate counsel's failure to raise it on direct appeal. *Id.* A defendant's failure to satisfy either *Strickland* prong will defeat a claim of ineffective assistance of counsel. *Id.*

¶ 87                          1. Failure to Stipulate to Shell Casings

¶ 88    On appeal, defendant first argues that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness based on failing to make a stipulation regarding the shell casings

recovered from the scene. In general, "[a]ppellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Simms*, 192 Ill. 2d 348, 362 (2000). We cannot say that appellate counsel was "patently wrong" not to raise the stipulation argument. Even assuming that trial counsel did not offer to stipulate to the shell casings, defendant has done nothing to show that the State would have agreed to any stipulation. The State "is not required to accept such a stipulation and has the right to prove every element of the crime." *People v. Chatman*, 110 Ill. App. 3d 19, 25 (1982).

¶ 89    Moreover, defendant has not shown how he was prejudiced by the lack of stipulation, especially where there was no forensic evidence tying him to the shell casings. Indeed, not stipulating to the shell casings actually allowed trial counsel to highlight the lack of forensic evidence, which was a major weakness in the State's case. For example, trial counsel was able to cross-examine the State's witnesses about the lack of forensic evidence and argue in closing that the shell casing evidence "just says that they were all fired from one gun. The fingerprints. Are you kidding me that they wasted our time with that? Why?" Accordingly, we cannot say that trial counsel was ineffective for failing to stipulate to the shell casings or that appellate counsel was ineffective for failing to raise the issue on direct appeal.

¶ 90                    2. Failure to Investigate Alibi Witnesses

¶ 91    Defendant next contends that appellate counsel was ineffective for failing to raise trial counsel's failure to investigate Yvette and Derrick Sylvester as alibi witnesses. We first note that, although defendant relies on the purported transcripts of Mroz's telephone conversations with Yvette and Derrick Sylvester, this information was outside the trial record and thus unavailable to appellate counsel. In any event, there are several other problems with defendant's argument. First,

defendant has offered no notarized or even signed documents from either Yvette or Derrick Sylvester. Instead, defendant attached the unsigned and unnotarized transcripts for the telephone conversations, which were apparently typed by Mroz. There is no indication that the transcripts were reviewed or approved by either alibi witness. Although Mroz signed a document stating that the transcripts were accurate reflections of the conversations, that document is also unnotarized. Our supreme court has stated "[a] claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness." *People v. Enis*, 194 Ill. 2d 361, 380 (2000); but see *People v. Dupree*, 2018 IL 122307, ¶¶ 40-42 (holding that an affidavit is not necessarily required in every case, such as when the defendant does not seek to introduce "new evidence that could only be verified by an affidavit from the proposed witness"). Here, there is no indication as to the content of Yvette and Derrick Sylvester's potential testimony other than the unnotarized document from Mroz. As such, dismissal of defendant's claim was appropriate because he failed to attach sufficient documentation for the trial court to determine whether there was a substantial showing of a constitutional violation.

¶ 92    Even assuming that Yvette and Derrick Sylvester were willing and available to testify in accordance with the unsigned, unnotarized transcripts attached to the amended petition, defendant still fails to make a substantial showing of ineffective assistance. According to the transcripts, Derrick Sylvester stated that he did not remember whether he ever gave the defense a statement because "it's been so many years, so much time has passed." However, he did recall that "someone" contacted him about the case. Although Yvette stated that she "never spoke to private investigator," she did not say whether she talked to trial counsel.

¶ 93    Regardless, defendant's assertion that trial counsel failed to investigate Yvette and Derrick Sylvester as potential witnesses is affirmatively rebutted by the record. Trial counsel explained at

the *Krankel* hearing that he investigated defendant's potential alibi witnesses and was able to secure their availability to testify at trial. However, counsel ultimately "made a strategic decision not to call those witnesses because [he] felt that they would not be believed by the jury and [the defense] would be in danger of damaging a lot of the reasonable doubt that [it] had established." This is corroborated by Yvette's statement to Mroz, which indicates that she was present for defendant's trial but not allowed into the courtroom because she was considered a potential witness. Thus, the record rebuts defendant's allegation that trial counsel did not investigate alibi witnesses, and his claim of ineffective assistance therefore fails.

¶ 94                            3. Failure to Call Alibi Witnesses

¶ 95    Finally, defendant claims that appellate counsel provided ineffective assistance by failing to argue on direct appeal that trial counsel was ineffective in failing to call Yvette and Derrick Sylvester as witnesses. However, to succeed on such a claim, appellate counsel would have had to overcome the "strong presumption" that trial counsel's actions or inactions were the product of a sound trial strategy. *Dupree*, 2018 IL 122307, ¶ 44. "Decisions about whether to call witnesses are generally considered matters of trial strategy and reserved to the discretion of trial counsel." *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 84. Although this court has occasionally found counsel's failure to present certain witnesses to be unreasonable, these cases generally arise where the record does not reveal a viable explanation for counsel's tactics. See, *e.g.*, *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 60 ("Although we give counsel deference to make strategic decisions at trial, the record is barren of any reasonable strategy that may have been employed by counsel in calling no witnesses and presenting no evidence.").

¶ 96    Here, we are presented with a somewhat atypical case where the trial record contains direct evidence of trial counsel's strategic thinking. Specifically, trial counsel explained at the *Krankel*

hearing that there were two reasons why he did not call the alibi witnesses at trial. First, trial counsel feared that they would not be believed by the jury and would therefore damage the case he was able to construct through cross-examination. Second, trial counsel believed the defense had already established reasonable doubt by the end of the State's case-in-chief "given the inconsistencies between the two eyewitnesses and other evidence that had been brought out." This explanation is in fact confirmed by defendant, who testified at the *Krankel* hearing that trial counsel told him it was "good on our behalf that he didn't put my alibi witnesses on the stand because we was [*sic*] winning."

¶ 97    We find trial counsel's strategy to be reasonable. As defendant himself vigorously argues on appeal, the testimony of both Smith and Hardy was at times inconsistent with itself, with each other, and with that of Roberts. There was also no forensic evidence of any kind tying defendant to the murder scene. Furthermore, trial counsel established several plausible reasons for the jury to view both Smith and Hardy skeptically. Under these circumstances, we find that it was clearly reasonable for trial counsel to rest on the weakness of the State's case without calling alibi witnesses. Accordingly, defendant's claim of ineffective assistance is without merit.

¶ 98                                III. CONCLUSION

¶ 99    For the reasons stated, we affirm the judgment of the circuit court.

¶ 100   Affirmed.