# Illinois Official Reports

## Appellate Court

---

### *People v. Evans*, 2017 IL App (1st) 143268

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHANNON EVANS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-3268 |
| Filed<br>Rehearing denied | June 6, 2017<br>July 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-12790; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Stephen Gentry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Claire Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Shannon Evans was convicted of first degree murder in the October 13, 2005, shooting death of Robert Duffy. He filed a postconviction petition asserting (1) actual innocence based on affidavits from two witnesses stating that Evans was not present when Duffy was shot and (2) ineffectiveness of trial counsel for failing to investigate witnesses who could have testified for Evans at trial. The trial court dismissed Evans's petition at the second stage of postconviction proceedings, finding that in light of the State's strong evidence of Evans's guilt, his "new" witnesses did not conclusively disprove the State's theory of the case nor was Evans prejudiced by the alleged mistakes of counsel. Evans now appeals. We agree with the trial court and affirm.

¶ 2                                            BACKGROUND

¶ 3 Because Evans purports to raise an actual innocence claim, it is necessary to set forth the trial testimony in some detail. Tina Mosley, Duffy's longtime girlfriend, testified that Duffy and Evans were friends and members of the Gangster Disciples street gang. They sold drugs together out of a house at 12210 South Parnell Avenue. One of their customers was Rashad Bethany, and Mosley frequently saw the three of them together.

¶ 4 The day after Duffy's death, Mosley met with Bethany and Evans. Evans had bloodshot eyes, was trembling, and appeared nervous. He told Mosley that he and Duffy had been conducting a drug deal at the Parnell house with members of another street gang. One of the other gang members pulled out a gun, and a fight ensued, during which Duffy was shot. Evans told Mosley he shot one of the other gang members and then fled to hide his gun. When he returned, he saw two bodies being placed in an ambulance. Mosley later learned that Duffy had been killed.

¶ 5 Eischa Toney testified that she lived about a block from the Parnell drug house. She had known Evans and Bethany since childhood. On the night of October 13, Evans, Bethany, and two other men known as Little Ricky and Peanut were drinking on her porch, as they often did. Shortly before Duffy was shot, all four left, heading in the direction of Parnell Avenue. Five to ten minutes later, Toney heard gunshots and saw the four men running away from Parnell Avenue, along with "everybody on the block." All of them ran in different directions.

¶ 6 Toney next saw Evans on the day of Duffy's funeral. Evans said that he was worried about being framed for Duffy's murder because the Parnell house was "his dope spot." He asked Toney whether she had heard anything about the shooting or if she knew people who were talking about it. Toney said she had not heard anything. A month or two later, when the four men returned to her home, Bethany bragged about robbing and shooting Duffy. Toney testified that she could not recall what, if anything, Evans said on that occasion. The State reminded Toney of her grand jury testimony, in which she stated that Evans admitted being "part of it" and also said that he helped to steal Duffy's money and drugs. Toney said, "I was asked those questions, and you say I answered that. Evidently, I answered that." After Toney's grand jury testimony, the State helped her relocate for her safety and paid her relocation expenses.

¶ 7 Patrick Fallie testified that he had known Evans since childhood. He claimed not to recall his whereabouts on the night of October 13, and he denied having any knowledge related to

Duffy's murder. He was then impeached with his grand jury testimony in which he testified that he was an eyewitness to the shooting and gave a detailed account of the murder.

¶ 8    In his grand jury testimony on April 12, 2006, Fallie stated that on the night of October 13, he was sitting in his car across the street from the Parnell house, waiting for two friends named Mike and Markina to purchase cigarettes from a neighboring house. As Fallie waited, he saw Duffy limp out of the front of the house, followed closely by Evans and another man. Both of the men following Duffy were holding handguns. Duffy turned to face Evans, holding his hands in front of his face as if to block a bullet and saying, "Don't shoot, don't shoot, it ain't worth it, don't kill me." Evans shot him four or five times, then picked up a bag that Duffy was carrying and ran away. Fallie told the grand jury that he did not tell this information to the police sooner because he was afraid for his life.

¶ 9    A forensic investigator with the Chicago police department testified that he recovered casings from two different caliber weapons at the Parnell house.

¶ 10    Evans's sole witness was Markina Polk, who testified that she witnessed the murder. Together with a friend she referred to as "Mike Mike," she went to the house next to the Parnell drug house to purchase cigarettes. Fallie, whom Polk knew, was sitting across the street in his car and waved to her. As Polk approached the cigarette house, she saw Duffy on the lawn of the house next door, arguing with two men whom she did not recognize, one of whom was armed. Polk did not see Evans on the scene. One of the men pushed Duffy, and the other man began shooting Duffy, at which point Polk ran into the cigarette house. She heard around five shots in total.

¶ 11    Some time later, Polk learned that Evans had been arrested for Duffy's murder. She attempted to contact authorities to tell them what she knew, but she did not pursue the matter because she was afraid of the real murderers. Additionally, Polk admitted that shortly before trial, Fallie asked her to deny seeing him at the scene of the murder.

¶ 12    Evans was found guilty of first degree murder with a firearm. He was sentenced to 45 years' imprisonment, plus a consecutive 20-year add-on for personally discharging a firearm. On direct appeal to this court, he argued that he was denied his right to a speedy trial, the trial court improperly admitted hearsay evidence, and the State failed to prove him guilty beyond a reasonable doubt. We affirmed his conviction in *People v. Evans*, 2011 IL App (1st) 091389-U, and his petition for leave to appeal to the Illinois Supreme Court was denied on November 30, 2011 (*People v. Evans*, No. 113097 (Ill. Nov. 30, 2011)).

¶ 13    Nine months later, on August 30, 2012, Evans filed his *pro se* postconviction petition. After Evans obtained counsel, his amended petition raised (1) an actual innocence claim and (2) an ineffective assistance of counsel claim based on trial counsel's alleged failure to investigate and present available evidence of Evans's innocence. The petition also raised various other claims that Evans does not pursue on appeal.

¶ 14    Evans's actual innocence claim is based upon the affidavits of Mike Miles and Tiara Murph. In Miles's affidavit, he stated that on the night of October 13, 2005, he drove Polk to the cigarette house. While he was waiting outside, he saw Duffy limping out of the house next door, being chased by two men. Miles recognized one of the men as "Gutta." He saw Gutta shoot Duffy in the head, and then the two men both shot Duffy three or four more times. Afterwards, the two men ran away; one of them made eye contact with Miles while running. Miles stated that he did not see Evans at any time during the incident. He never contacted the

police because he feared for his life. Nevertheless, he said that he was willing to testify for Evans at an evidentiary hearing and would have testified for him if called at trial.

¶ 15 In Murph's affidavit, she stated that she was walking home when she observed two men with guns chasing Duffy out of the house next to the cigarette house. She heard shooting and ran. Because she was scared for her life, she told nobody about the incident except for her grandmother, who moved Murph to Indiana for her safety. A few years ago, Murph moved back to Chicago because she thought "enough time had passed that it would be okay," although she was still afraid. Four months ago, she learned that Evans had been convicted of Duffy's murder. She knew Evans from the neighborhood and knew that she did not see him on the day of the murder, so she decided to come forward to tell what she had witnessed.

¶ 16 Regarding his ineffective assistance of counsel claim, Evans argued that his trial counsel should have called Miles to testify on his behalf. He stated that counsel should have been aware of Miles's existence because both Fallie and Polk named "Mike" as a witness to the crime.

¶ 17 Evans also argued that trial counsel was ineffective for failing to investigate Hosea West as a potential exculpatory witness. In pretrial discovery, the State disclosed a police report detailing an interview with West on October 23, 2005. West told police that he was in the area of the shooting on the evening of the murder. He saw Bethany and spoke briefly with him; then Bethany left, accompanied by Little Ricky and Peanut. Later, West heard gunshots. He saw Little Ricky and Peanut running toward him from the direction of Parnell Avenue, followed by Bethany, who glared at him. West did not see Evans on that day. According to West, word on the street was that Bethany "set up" Duffy to be killed, but Evans did the actual shooting.

¶ 18 The State filed a motion to dismiss Evans's postconviction petition, which the circuit court granted on August 5, 2014. The court found that Evans's petition was untimely, having been filed two days after the statutory deadline. The court also found that Evans's claims were not meritorious. Regarding the actual innocence claim, the court found that Miles's and Murph's affidavits were cumulative of Polk's testimony and did not add anything to the theory of the case Evans advanced at trial. It also found that Miles's affidavit was not newly discovered since multiple witnesses referenced "Mike" at trial, indicating that counsel could have discovered Mike through due diligence. Regarding the ineffective assistance of counsel claim, the court found that since Miles's testimony would have been cumulative of Polk's testimony, Evans was not prejudiced by counsel's failure to call Miles at trial. The court did not specifically address the police interview with West.

¶ 19 Evans filed a motion to reconsider, arguing that he was not culpably negligent for his untimely filing because he relied on the erroneous advice of counsel. Before Evans filed his postconviction petition, his mother contacted Evans's current postconviction counsel for advice, although she was unable to pay the required retainer. Counsel incorrectly informed Evans that the filing deadline was nine months from the denial of his petition for leave to appeal, and Evans relied on that advice in filing his petition. Evans attached an affidavit from his postconviction counsel in which she corroborated Evans's allegations.

¶ 20 On September 30, 2014, the trial court found that Evans was not culpably negligent for his untimely filing, but it ruled that the portion of the court's order dismissing his petition on the merits would stand.

ANALYSIS

The Post-Conviction Hearing Act sets forth a three-stage process for adjudicating a postconviction petition. 725 ILCS 5/122-1 *et seq.* (West 2014). At the first stage, the court independently reviews the petition to determine whether it sets forth the gist of a constitutional claim. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). If so, the petition advances to the second stage, where the petitioner may amend his petition with the assistance of appointed counsel and the State may move to dismiss or answer the petition. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). To survive a motion to dismiss, the petition must make a "substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). All well-pleaded facts not positively rebutted by the trial record are taken as true, and the trial court is not to engage in factfinding or credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998); *People v. Hall*, 217 Ill. 2d 324, 334 (2005). Credibility determinations are reserved for the third stage of postconviction proceedings, where the trial court holds an evidentiary hearing on petitioner's claims. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). We review the second-stage dismissal of a postconviction petition *de novo*. *Id.*

## Timeliness of Evans's Petition

Initially, the State argues that Evans's postconviction petition was untimely since it was filed two days after the statutory deadline. This deadline does not apply to actual innocence claims, which are not subject to time constraints (725 ILCS 5/122-1(c) (West 2014)), but it does apply to Evans's ineffective assistance of counsel claim. Evans concedes untimeliness, but he argues that his late filing was not due to his culpable negligence, since he was relying on the erroneous advice of postconviction counsel. We agree with Evans.

After Evans's conviction was affirmed on direct appeal, his petition for leave to appeal to the Illinois Supreme Court was denied on November 30, 2011. From that date, Evans had 90 days to file a petition for a writ of *certiorari* to the United States Supreme Court (Sup. Ct. R. 13) and an additional six months to commence postconviction proceedings (725 ILCS 5/122-1(c) (West 2012))—*i.e.*, until August 28, 2012. But Evans relied on the advice of his postconviction counsel, who erroneously told him that he had nine months in which to file his petition. Evans therefore filed his petition two days after the deadline, on August 30, 2012.

Thus, we can only consider Evans's claim of ineffective assistance of counsel if Evans demonstrates that his late filing was not due to his culpable negligence. *Id.* Culpable negligence is "something greater than ordinary negligence and is akin to recklessness." *People v. Boclair*, 202 Ill. 2d 89, 108 (2002). To show a lack of culpable negligence, a defendant must present allegations of specific fact showing why his tardiness should be excused (*People v. Hobson*, 386 Ill. App. 3d 221, 233 (2008)); vague or conclusory assertions will not suffice (*People v. Gunartt*, 327 Ill. App. 3d 550, 552 (2002)).

Under the circumstances, we find that Evans's untimely filing was not due to his culpable negligence. Our supreme court dealt with a similar situation in *People v. Rissley*, 206 Ill. 2d 403, 410 (2003), where defendant's counsel erroneously informed him that he had three years from the date of his sentencing to file a postconviction petition. Defendant had no reason to question the advice of his counsel and had every reason to believe his petition was timely filed. *Id.* at 421. Thus, the *Rissley* court held that defendant was not culpably negligent for his late filing. *Id.*; see also *Hobson*, 386 Ill. App. 3d at 237 (finding a lack of culpable negligence upon similar facts). Likewise, Evans was not culpably negligent for relying upon the erroneous

advice of his postconviction counsel regarding the filing deadline.

¶ 28                                   Actual Innocence

¶ 29    Evans argues that the trial court erred in dismissing his actual innocence claim because, he contends, the eyewitness accounts of Miles and Murph were new and noncumulative evidence that he did not kill Duffy. The State contends that the facts contained in their affidavits were not newly discovered, and in any event, their affidavits were cumulative of the testimony of Polk, who also stated that Evans was not present when Duffy was shot.

¶ 30    We first take issue with Evans's characterization of his claim as one asserting his actual innocence. An actual innocence claim does not merely challenge the strength of the State's case against the defendant. *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008). Indeed, it is well-established that sufficiency of the State's evidence is not a proper issue for a postconviction proceeding. *Id.* at 638. Rather, the hallmark of an actual innocence claim is " 'total vindication' " or "exoneration" (*id.* at 636 (quoting *People v. Savory*, 309 Ill. App. 3d 408, 414-15 (1999))); it is a claim that the defendant is free of *any* criminal involvement, either in the crime for which he was convicted or any lesser included offense. *People v. Barnslater*, 373 Ill. App. 3d 512, 520 (2007).

¶ 31    In light of (i) Evans's admission to Mosley that he was present at the time Duffy was shot, he was armed, and he fired his weapon, (ii) Toney's and Fallie's grand jury testimony admitted substantively during Evans's trial, and (iii) Polk's trial testimony that Evans was not the man pointing a gun at Duffy, Miles's and Murph's affidavits bear only on the sufficiency of the evidence. Evans has already advanced—and lost—a sufficiency of the evidence argument in his direct appeal. *Evans*, 2011 IL App (1st) 091389-U, ¶ 33. And, as we discuss below, the evidence Evans proffers is cumulative of Polk's testimony to the effect that Evans was not present when Duffy was shot and that, in fact, someone else was pointing a gun at Duffy. Thus, we could dispose of the issues in this appeal (save for Evans's ineffective assistance claim) on *res judicata* grounds. *People v. Fair*, 193 Ill. 2d 256, 267 (2000) (*res judicata* precludes issues that were raised on direct appeal from being raised again in postconviction petition (citing *People v. Emerson*, 153 Ill. 2d 100, 106 (1992) (postconviction petitioner cannot avoid the bar of *res judicata* simply by rephrasing claims raised on direct appeal))); see also *Collier*, 387 Ill. App. 3d at 638 (rejecting petitioner's actual innocence claim where "it is inescapable that the defendant has repackaged the reasonable doubt arguments advanced at trial, on direct appeal, and collateral review and placed them upon the altar of actual innocence").

¶ 32    But even if we accepted the "actual innocence" label Evans attaches to his petition, we would reach the same result. Because the conviction of an innocent person violates due process, a postconviction petitioner has the right to assert a claim of actual innocence based upon newly discovered evidence. *People v. Coleman*, 2013 IL 113307, ¶ 84 (citing *People v. Washington*, 171 Ill. 2d 475, 488-89 (1996)). To obtain relief, defendant must present evidence that is (1) new, in that it could not have been discovered prior to trial through due diligence, (2) material to the issue of defendant's innocence, (3) noncumulative of the evidence presented at trial, and (4) sufficiently conclusive that it would probably change the result on retrial. *Id.* ¶ 96. Defendant bears the burden of demonstrating these elements by a preponderance of the evidence. *Id.* ¶ 92.

¶ 33    Miles's affidavit was not newly discovered because defendant has not shown that his testimony was undiscoverable prior to trial. On the contrary, both Polk and Fallie (via his grand

jury testimony) testified that Polk was accompanied to the cigarette house by her friend "Mike." Thus, defense counsel should have been aware of "Mike" as a potential witness to the shooting. Miles, for his part, never averred that after the shooting he made himself unavailable to investigators. On the contrary, he stated that he would have testified for Evans if called at trial. Accordingly, Evans has failed to make a substantial showing that Miles's testimony could not have been discovered prior to trial through due diligence.

¶ 34    As for Murph's affidavit, Evans argues that it is newly discovered because he could not have discovered prior to trial that Murph was a witness to the crime: she told nobody about the incident except for her grandmother and moved to Indiana afterwards. The State argues that, regardless of Murph's availability, her affidavit is not new because the facts she alleges were already known to defendant at the time of trial. See *Barnslater*, 373 Ill. App. 3d at 523 ("evidence is not 'newly discovered' when it presents facts already known to the defendant at or prior to trial, *though the source of those facts may have been unknown, unavailable, or uncooperative*" (emphasis added)).

¶ 35    We need not resolve this issue because, regardless of whether Murph's affidavit qualifies as newly discovered, it is readily apparent that it is cumulative of Polk's trial testimony. Both witnesses had substantially the same version of events. Polk stated that she saw Duffy on the lawn of the Parnell house, arguing with two men, neither of whom were Evans. One of the men shoved Duffy, and then the other man shot him. Murph averred that she saw Duffy being chased out of the Parnell house by two men, and then she heard gunshots. Evans, whom Murph knew, was not one of the men. Murph's testimony does not differ from Polk's testimony in any material aspect, except that she describes the confrontation in less detail and did not see the actual shooting. Presenting her testimony at trial would not have added anything to the evidence that was already before the jury.

¶ 36    Evans argues that Murph's testimony should not be considered cumulative because Polk was "substantially impeached" at trial and, therefore, Murph's testimony would have been more convincing. We note that this argument is directly contrary to Evans's position on direct appeal, where he argued that Polk's testimony "was not impeached or inconsistent in any manner." In any event, Evans does not provide any authority for the proposition that an actual innocence claim is valid when a newly discovered witness, whose testimony is cumulative of exculpatory testimony presented at trial, is "better" than the witness who actually testified. The sole case cited by Evans on this issue is *In re Lane*, 71 Ill. App. 3d 576, 580 (1979), which did not concern a postconviction proceeding, but the court's exclusion of an alibi witness at a probation hearing. Finding the exclusion of the witness to be an abuse of discretion, the court in *Lane* noted that the alibi witness that had been permitted to testify had been "clearly discredited" because he admitted to being drunk. *Id.* No such circumstances are present here.

¶ 37    We disagree that Murph's testimony was "better" than Polk's. Most critically, because Murph did not see the actual shooting, her testimony is of limited value in determining whether Evans was the shooter. On the issue of credibility, Evans argues that Polk's credibility was impaired by her statement on cross-examination that she did not come forward sooner because she feared for her life. But Murph's testimony suffers the same alleged infirmity: she also initially chose not to contact authorities out of fear for her life.

¶ 38    Evans also lists various other ways in which Polk's testimony was purportedly impeached: she purchased marijuana from Fallie, she was an acquaintance of Evans, and she only saw one of Duffy's assailants holding a gun (unlike Murph, who stated that both men were armed). We

would not characterize any of this as substantial impeachment. First, the trial court struck Polk's testimony about purchasing marijuana, and the jury is therefore presumed not to have considered that statement. *City of Chicago v. Eychaner*, 2015 IL App (1st) 131833, ¶ 105. In any event, there was no implication that Polk was under the influence of marijuana at the time she witnessed Duffy's murder. Furthermore, the fact that she only saw one of the assailants holding a gun is a minor discrepancy that does not significantly discredit her testimony that Evans was not present. And Murph, like Polk, was acquainted with Evans.

¶ 39　　Finally and most importantly, Miles's and Murph's affidavits, whether viewed individually or together, are not sufficiently conclusive that they would likely change the result on retrial, given the strength of the State's evidence against Evans. See *People v. Sanders*, 2016 IL 118123, ¶ 47 ("the conclusiveness of the new evidence is the most important element of an actual innocence claim"). First, according to Mosley's unimpeached testimony, Evans admitted the day after the murder that (i) he was present when Duffy was shot (supposedly by a rival gang member), (ii) he had a gun, and (iii) he shot someone. Thus, Evans's own admissions contradict the testimony of his witnesses that he was not present during the shooting.

¶ 40　　Second, both Fallie and Toney directly implicated Evans in their grand jury testimony, which was admitted as substantive evidence at trial. Fallie, who was sitting in his car across the street from the Parnell house, testified that he saw Evans shoot Duffy four or five times. Toney testified that on the night of the murder, she saw Evans, Bethany, and two other men heading for the Parnell house; shortly thereafter, gunshots were fired, and Toney saw all four men running away from the house. Evans later admitted to her that he was "part of it" and helped to steal Duffy's money and drugs.

¶ 41　　Although Fallie and Toney recanted their grand jury testimony at trial, recantations are considered inherently unreliable (*People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). Fallie's recantation is particularly incredible under the circumstances: before the grand jury, he gave a detailed eyewitness account of the murder that was consistent with the physical evidence and the testimony of the State's other key witness, but, at trial, he claimed to have no memory of that evening. The jury was entitled to disregard Fallie's claimed lack of memory and to credit his grand jury testimony. As for Toney, she admitted that after her grand jury testimony, the State paid to relocate her for her safety—which would only be necessary if she did, in fact, implicate Evans.

¶ 42　　Thus, in light of the State's evidence against Evans, the testimony of Miles and Murph would not have changed the jury's verdict. See *Sanders*, 2016 IL 118123, ¶ 53 (evidence was not so conclusive as to change the probable result on retrial where it "merely contradict[ed] the testimony of other occurrence witnesses"). For this reason, as well as our earlier findings that Miles's testimony was not newly discovered and Murph's testimony was cumulative of Polk's testimony, Evans has not established the necessary elements for a claim of actual innocence.

¶ 43　　　　　　　　　　Ineffective Assistance of Trial Counsel

¶ 44　　Evans next argues that his trial counsel was ineffective for failing to investigate and present Miles and West as exculpatory witnesses. The State argues that Evans failed to establish a reasonable probability that their testimony would have changed the outcome of the trial, given the strength of the State's case against Evans.

¶ 45     Both the United States Constitution and the Illinois Constitution provide that a criminal defendant has the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant is deprived of the effective assistance of counsel when (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. See *People v. Lee*, 2016 IL App (1st) 152425, ¶ 54 (applying *Strickland*).

¶ 46     To establish the first *Strickland* prong, a defendant must show that "counsel's performance was objectively unreasonable under prevailing professional norms." *People v. Domagala*, 2013 IL 113688, ¶ 36. A mistake in trial strategy, without more, does not satisfy this prong; on the contrary, counsel's strategic decisions are afforded considerable deference. *People v. McGee*, 373 Ill. App. 3d 824, 835 (2007). As the *Strickland* Court stated, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Deciding whether to call a witness at trial is a matter of trial strategy, and accordingly, there is a strong presumption that such decisions reflect sound strategy rather than incompetence. *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

¶ 47     For the second *Strickland* prong, the defendant must show that there is a reasonable probability that the outcome of the proceeding would have been different if not for counsel's unprofessional errors. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" (*People v. Colon*, 225 Ill. 2d 125, 135 (2007)), but it need not be over 50% (*People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008) (citing *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001))).

¶ 48     It is not clear from the record whether trial counsel ever talked to West about appearing as a defense witness. But even if counsel did not, we do not believe he may be faulted for that decision. Based upon the police report adduced by Evans, West's testimony would have been of little value to the defense. West did not see any part of the altercation with Duffy, let alone the actual shooting. Additionally, his statement that he saw Bethany, Little Ricky, and Peanut after the shooting—but not Evans—is consistent with Toney's testimony that after the shooting, everyone (including Evans) fled the scene in different directions. Thus, it is unlikely that West's testimony would have changed the outcome of the trial, and counsel's decision not to pursue this avenue of investigation would have been reasonable.

¶ 49     As for Miles, Evans has not demonstrated that his testimony would have created a reasonable probability of a different outcome. As discussed, the State's case against Evans was strong; if the jury chose to disbelieve Polk, it is unlikely that calling her friend to the stand to recite a similar account of events would have changed their minds. Because Evans has not satisfied the prejudice prong of *Strickland*, his ineffective assistance claim necessarily fails. See *People v. Garman*, 2016 IL App (3d) 150406, ¶ 13 (if counsel's actions did not prejudice defendant, a court need not decide whether counsel's performance was constitutionally deficient (citing *People v. Griffin*, 178 Ill. 2d 65, 74 (1997))).

¶ 50                    CONCLUSION

¶ 51        For the foregoing reasons, we affirm the trial court's second-stage dismissal of Evans's postconviction petition.

¶ 52        Affirmed.