2025 IL App (1st) 231255-U

SECOND DIVISION
February 18, 2025

No. 1-23-1255

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05CR21830 |
| | ) | |
| TYRONE EVERHART, | ) | Honorable |
| | ) | Michele Pitman, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court properly dismissed defendant's postconviction petition as untimely because he failed to show that his late filing was due to a lack of culpable negligence.

¶ 2   Defendant Tyrone Everhart appeals from the trial court's second stage dismissal of his *pro se* postconviction petition as untimely. Defendant argues that the trial court erred in dismissing his petition because he alleged supporting facts to establish a lack of culpable negligence. He contends that the trial court was required to conduct an evidentiary hearing on his credibility. Defendant further contends he made a substantial showing that his trial counsel was

ineffective for failing to call defendant to testify at both his pretrial suppression hearing and at trial.

¶ 3    In September 2005, defendant was charged with multiple felony offenses, including aggravated kidnapping, aggravated criminal sexual assault, and armed robbery arising from the May 7, 2005, sexual assault of D.R. Prior to trial, the State moved to admit evidence of defendant's previous conviction from 1994 for aggravated criminal sexual assault, which the trial court subsequently granted over defendant's objection.

¶ 4    We discuss the evidence presented at defendant's trial as background before reaching the issues on appeal. A full discussion of the evidence presented at defendant's trial is set forth in *People v. Everhart*, 405 Ill. App. 3d 687 (2010).

¶ 5    Prior to trial, defendant filed a motion to suppress his statement alleging that the police violated his *Miranda* rights when they continued to question him after he invoked his right to remain silent. At the hearing on defendant's motion, the State presented testimony from multiple police officers as well as an assistant State's Attorney (ASA). Oak Forest Detective Rich Belcher advised defendant of his *Miranda* rights after placing defendant under arrest. Although, defendant stated that he understood his rights, he refused to sign the *Miranda* waiver form. Later, Detective Belcher, ASA Nick Karas, and Detective David Cyborski from Tinley Park spoke with defendant. ASA Karas read defendant his *Miranda* rights and this time defendant signed the waiver form. Defendant agreed to give a statement. All of the State's witnesses each testified that defendant did not invoke his right to remain silent. Defendant did not testify or present any additional evidence. The trial court denied defendant's motion.

¶ 6    At trial, the victim, D.R., gave the following testimony. On May 7, 2005, D.R. worked as a bartender until closing and drove home around 3 a.m. She drove approximately three miles to her apartment on the 16000 block of Laramie Avenue in Oak Forest. D.R. had not observed

anyone following her or see anyone else when she entered the parking lot of her building. There were no lights in the parking area, but a small light was on above the door to her building. D.R. parked in her assigned parking space behind her building near a wooded area and then walked to her door with her purse and her keys in her hand.

¶ 7    As D.R. put her key in the door, she was grabbed from behind and pulled to the ground. She did not see the person's face. She tried to scream but the offender's arm was over her mouth. The man told her to "shut up," and not to scream. He asked if she had any money, and she told the offender to take her purse. The man placed an object to D.R.'s head and asked her if she knew what it was. He made her reach up and touch the object. D.R. stated that it was cold, hard metal and it felt like a gun. He said, "If you scream or fight, I'll blow your f*** head off." D.R. stopped screaming. She testified that she believed the man held a gun to her head.

¶ 8    The man asked D.R. if she would cooperate, and she responded that she would. She described the voice as calm and clear, with no accent. He made her get up and walk back to where her car was parked. As they walked, the man kept his arm around her and the gun pressed to her head. At the car, the man bent D.R. over the hood of the car and again asked if she was going to cooperate. She said yes. The man told D.R. to take off her pants and underwear. The man then inserted his penis into her vagina. He asked her if she liked it and told her to say that she "liked it" and "wanted his f*** c*** in [her]." She estimated that the sexual assault lasted five to six minutes.

¶ 9    After the man finished, he pulled up his pants but told D.R. not to touch hers. He lifted her from the hood of the car and told her "not to scream or make any noise or he would blow [her] f*** head off again." The man then walked her into the trees behind her building, near a creek. She was facing the trees. He told her to stay there and count to 20, but if he heard her move or stop counting, then "he would blow [her] head off." He let go and D.R. started counting.

3

¶ 10     D.R. stated that she heard him walking back toward the door. After she heard a car door slam and a car leaving, she pulled up her pants and walked toward her car. D.R.'s purse was gone, but her keys were still in the door. She went inside and called 911. D.R. told Officer James Morrissy what happened, and he called for an ambulance to take D.R. to the hospital for an examination.

¶ 11     D.R. did not know defendant's name and did not recognize anyone in the courtroom other than the prosecutors. She could not describe the offender and was unable to identify anyone from photographs.

¶ 12     Officer Morrissy, an Oak Forest patrol officer, received a dispatch at 3:21 a.m. on May 7, 2005, to investigate a robbery on the 16000 block of  Laramie Avenue. Upon arrival, he went to D.R.'s apartment and D.R. came outside sobbing. She told Officer Morrissy what happened to her, including the sexual assault. He advised his supervisor of the sexual assault and called for a detective and an ambulance. He observed that she was wearing pants and a t-shirt and that her clothes were not ripped or dirty. D.R. took him to the location where the sexual assault occurred. He saw that the hood of D.R.'s car was dirty, except for one spot that was "unusually clean." He also noticed a milky substance on the ground and informed the detective about it. D.R. told him that the offender put an object to her head, but she did not tell him that she reached up and felt the object.

¶ 13     Officer Morrissy followed the ambulance transporting D.R. to South Suburban Hospital. He waited outside the room while the medical personnel collected evidence for the sexual assault kit. He was later given the sealed kit, two sealed envelopes with D.R.'s bra and underwear, and a paper bag with her pants. He gave D.R. a ride home and then took the sexual assault kit and other items to the police station.

4

¶ 14    Nancy Healy testified that on May 7, 2005, she was training to be a sexual assault nurse examiner (SANE) at South Suburban Hospital. Healy assisted a SANE certified nurse in treating D.R. She stated that D.R. appeared "distraught," "trembling," "quiet," and "upset." Healy and the SANE nurse collected evidence for the sexual assault kit, including mouth, vaginal and anal swabs, a blood sample, fingernail specimens, public hair combings, a swab from D.R.'s right ear and D.R.'s clothing. Healy stated that D.R. had "an abrasion to the 7:00 o'clock position" outside the vaginal opening, which Healy explained was a common injury with vaginal penetration. Healy testified that D.R. had no other bruises or injuries to her body.

¶ 15    Detective Belcher responded to the call from Laramie Avenue at approximately 3:30 a.m. on May 7, 2005. When he arrived at the location, other officers informed him of the robbery and sexual assault. Detective Belcher did not speak with D.R. at the scene because Officer Morrissy had a rapport with her and she was upset. Detective Belcher photographed the scene around D.R.'s car and collected evidence. Specifically, he took a sample of a liquid drop in front of the car and a cigarette butt.

¶ 16    At around 4:40 a.m., Detective Belcher received a call from dispatch informing him that a Tinley Park officer had recovered D.R.'s check book. He went to the scene, photographed the check book, and put the check book cover into evidence. At approximately 5 a.m., he received another call advising him of the recovery of a change purse near Oak Park Avenue and 156th Street. The detective went to that location, photographed the change purse, and collected it for evidence.

¶ 17    On May 9, 2005, Detective Belcher met with D.R. at the police station. She identified the check book and change purse as belonging to her. She noted that she was not missing any checks. Detective Belcher returned the change purse and check book to her but kept the check book cover because it had smooth vinyl surface suitable for fingerprints. D.R. told Detective

Belcher that "she felt a weapon was placed against her head and she was told by the offender 'if you don't cooperate or do what I say, I will blow your f*** brains out.' "

¶ 18    Detective Belcher later took the evidence to the Illinois State Police crime lab in Joliet. In June 2005, he received information from the crime lab that semen had been recovered from D.R.'s underwear, vaginal, and anal swabs. Later that month, he received information from a lab analyst and based on that information, Detective Belcher had a suspect. He obtained a photograph of the suspect and showed D.R. a photo array, but she was unable to recognize anyone.

¶ 19    On June 28, 2005, Detective Belcher went to an address in Markham and defendant answered the door. Belcher identified defendant from the photograph and placed him under arrest. Defendant's girlfriend gave consent for the detective to search her car outside the residence. During the search, Detective Belcher recovered "a small semi-automatic pistol look-a-like lighter" from the center console of the vehicle. He placed the lighter into evidence and transported defendant to the police station.

¶ 20    Later that afternoon, Detective Belcher spoke with defendant at the Oak Forest police station and provided defendant with his *Miranda* rights. Defendant stated that he understood his rights but refused to sign the *Miranda* waiver form. Detective Belcher told defendant why he was under arrest and asked defendant if he knew D.R., and defendant said he did not. The detective also asked defendant if he knew any women from Oak Forest and if he ever had nonconsensual sex with any women from Oak Forest, defendant answered in the negative. Detective Belcher obtained a warrant for a buccal swab from inside defendant's mouth.

¶ 21    That evening, Detective Belcher met with ASA Nick Karas. Detective Belcher, Karas, and another detective from Tinley Park spoke with defendant. ASA Karas read defendant his

Miranda rights and this time defendant signed the waiver form. Defendant agreed to give a statement.

¶ 22    Defendant told ASA Karas and the detectives that he was on southbound Cicero Avenue at 159th Street when he saw a small silver car drive through the intersection with a lone white female driver. He followed that car westbound on 159th Street and saw the car turn onto Laramie Avenue. He went past that intersection, made a U-turn, and then turned onto Laramie. He could still observe the silver car's taillights. He continued to follow the car to D.R.'s address on Laramie Avenue. When he turned into the apartment complex, he lost sight of the car for awhile, but he saw the light go on inside the car when D.R. opened her car door.

¶ 23    Defendant waited until D.R. was approaching the rear door of her building. He "followed up from behind her, threatened her life, brought her to the front of her car, had her bend over, had her pull her pants down and sexually assaulted her." Defendant told them he made D.R. walk into a small, wooded area in front of her car. He then picked up her purse and cell phone and ran to his car. He left, driving north on Laramie and then west on 159th. He discarded things from D.R.'s purse as he was driving, only keeping the money.

¶ 24    ASA Karas also testified substantially the same as Detective Belcher regarding the details of defendant's oral statement. ASA Karas asked defendant to memorialize his statement, but defendant refused to write down or videotape his statement.

¶ 25    Katherine Sullivan testified as an expert in forensic biology. As a forensic scientist with the Illinois State Police crime lab, she analyzed the evidence in this case and discovered trace amounts of semen in D.R.'s underwear and her vaginal and anal swabs. She created a DNA profile from that evidence. Later, she received defendant's buccal swab and compared the DNA profile from the swab to the DNA profile from vaginal and anal swabs and underwear. Sullivan concluded the DNA profiles were a match to defendant.

¶ 26    Michael Tardy testified that in 1994, he was the supervisor for the detective division of the Hickory Hills police department. In November 1994, he was assigned to investigate the criminal sexual assault of G.C. He had defendant in custody as a suspect in that case. Tardy identified defendant in court as the suspect in the 1994 case. Tardy admitted that he had no knowledge or involvement in the current case.

¶ 27    G.C. testified that at about 12:30 a.m. on November 30, 1994, she was at a grocery store in Hickory Hills. As she was about to enter her car, a person came up behind her, told her to move over and pushed her into the passenger seat of the car. The offender told her he had a gun and told her to give him her keys. The offender told her not to look at him and to keep her head down. G.C. said she begged him to take her purse and her money. She felt an object at her side, and she believed it was a gun. The man proceeded to drive her car to another location. He stopped the car and told her to remove her pants and shoes.

¶ 28    The offender then began to kiss her and rub her breasts over and under her clothes and vagina. He made her turn around and bend over the back of the car seat. The offender then rubbed her buttocks and inserted his fingers into her vagina and anus. G.C. testified that she did not know how long it lasted because "it seemed like forever. It may be half hour [sic]." While this was happening, the offender told her that he was not going to hurt her, but not to say anything because he knew the police and would find out. He said he had her purse and knew where she lived. G.C. described his voice as very calm and very stern. When he finished, she put her clothes and shoes back on.

¶ 29    Defendant told G.C. to keep her head down and not to look at him. He continued to hold an item he said was a gun to G.C.'s side. She cooperated with him. Defendant drove around and eventually stopped the car. He told G.C. to get out of the car, but she did not at first because she was scared that he would shoot her. She exited the car and defendant left. She called a roommate

8

to pick her up and then she called the police. G.C. identified defendant in court as the man who sexually assaulted her in 1994, and that defendant had pled guilty in her case. She testified that she did not know anything about the current case.

¶ 30    The State rested after G.C.'s testimony. Defendant then moved for a directed verdict, which the trial court denied. Defendant's attorneys then informed the trial court that they had advised defendant not to testify. The court then admonished defendant about his right to testify. Defendant indicated on the record that he understood his right and, after speaking with his attorneys, he decided not to testify. The defense rested without presenting any evidence.

¶ 31    Following deliberations, the jury found defendant guilty of aggravated criminal sexual assault. At the subsequent sentencing hearing, the trial court sentenced defendant to a mandatory term of natural life in prison since this was defendant's second conviction for aggravated criminal sexual assault.[1]

¶ 32    On direct appeal, defendant raised multiple issues, including that: (1) his trial counsel was ineffective for stating that defendant would testify during opening statements but defendant then did not testify at trial; (2) the trial court improperly admitted evidence of defendant's prior conviction for aggravated criminal sexual assault; and (3) the State failed to prove defendant acted in a manner to threaten or endanger life as required under the aggravated criminal sexual assault statute. This court rejected defendant's claims and affirmed his conviction and sentence. See *Everhart*, 405 Ill. App. 3d at 706. Defendant filed a petition for leave to appeal (PLA) in the

---

[1]    Defendant's sentence was imposed under section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 2008)), which is now codified under section 11-1.30(d)(2) of the Criminal Code of 2012 (720 ILCS 5/11-1.30(d)(2) (West 2022)).

Illinois Supreme Court, which the supreme court denied on March 30, 2011. Defendant did not file a petition for *certiorari* with the United States Supreme Court.

¶ 33    In May 2015, defendant filed his *pro se* postconviction petition in the circuit court. In his petition, defendant alleged multiple claims of ineffective assistance of trial counsel, including: (1) counsel failed to call defendant to testify at a pretrial hearing on defendant's motion to suppress his confession; and (2) counsel advised defendant not to testify at trial. In support, defendant attached his own affidavit detailing what his testimony would have been.

¶ 34    In his affidavit, defendant stated that he told Detective Belcher that he did not want to talk, he wanted a lawyer, and he would not sign anything. He later signed the waiver during an interview with the ASA and a detective from Tinley Park and only answered their questions about a crime in Tinley Park. He stated that no detectives from Oak Forest were present in the room. Regarding his proposed trial testimony, defendant stated that he had met D.R. in a bar in January 2005 and they engaged in a consensual sexual relationship. Defendant said he informed D.R. that he had a pregnant girlfriend and was not going to end that relationship. In May 2005, defendant ended his sexual relationship with D.R. On May 7, 2005, defendant met D.R. in the parking lot of her apartment building at D.R.'s request. The two of them talked, agreed to remain friends, and engaged in sexual intercourse inside D.R.'s car and on the hood. Defendant then left and went home. Defendant also attached multiple pages of the report of proceedings to support his allegations.

¶ 35    The trial court docketed defendant's petition in July 2015 and an attorney was appointed to represent defendant. Defendant, through counsel, filed a supplemental petition in February 2022, with additional support for his claims of ineffective assistance of trial counsel as well as a claim of ineffective assistance of appellate counsel for failing to argue these claims of trial counsel's ineffectiveness on direct appeal.

¶ 36    The State moved to dismiss defendant's postconviction petition in June 2022. Specifically, the State argued that: (1) defendant's petition was untimely; (2) his allegations of ineffective assistance of trial counsel lacked merit; and (3) the allegations of ineffective assistance of appellate counsel failed because the underlying claims were without merit. The State pointed out that defendant's direct appeal was affirmed on November 5, 2010, and his PLA to the supreme court was denied on March 30, 2011. Consequently, defendant was then required to file his postconviction petition by December 28, 2011, but he did not file his petition until May 15, 2015. Since defendant's petition was not timely filed, the State argued the petition should be dismissed without consideration on the merits.

¶ 37    In response, defendant asserted that his petition should not be dismissed as untimely because of his lack of culpable negligence. In his initial affidavit, and in a supplemental affidavit, defendant alleged that his petition was untimely because he was not a lawyer, and he has "not been educated in the complexities of the law." He further stated that upon the resolution of his direct appeal, his appellate attorney "did not explain the post-conviction process or the time limitations that apply." Defendant said that it was his understanding that his appellate counsel "would exhaust all possible claims regarding [his] case, including any filings beyond the appeal." According to defendant, his appellate counsel discussed his PLA and "indicated that he would take care of [defendant's] 'Post.' " Defendant was "under the impression that [his] appellate attorney would handle all filings including [his] postconviction petition." When defendant did not hear anything for years, he learned that nothing had been filed regarding his postconviction petition and he pursued filing a *pro se* petition.

¶ 38    Defendant also stated that from 2008 to 2021, he was classified as escape level E, which meant "extremely high risk of escape" and this classification provided him "little to no access to the law library and prevented [him] from having access to [his] legal property." This

classification also caused defendant to be transferred every year to "Pontiac, then Menard, then Stateville" and each institution had their own rules for access to the law library. While at the Pontiac Correctional Center, the individual responsible for processing the request slips to obtain access to the law library denied 85% of defendant's requests. According to defendant, it was "rumored" that a family member of this same individual was a victim of sexual assault, and this influenced the granting or denying requests for access to the law library. The timing of the denial of a request slip made it "impossible" to request access until the following week. When defendant was transferred from Menard to Pontiac from 2010 to 2011, his legal box with his legal papers was not transferred. He made multiple requests to Menard Correctional Center for his legal box. He did not receive his legal box until he was transferred back to Menard in 2013.

¶ 39    In February 2023, the trial court conducted hearing on the State's motion to dismiss and heard arguments from both parties. In June 2023, the court dismissed defendant's petition as "grossly untimely" on the record. The court stated:

> "First, with regards to petitioner's allegations in the filing of a post-conviction petition, the Court has looked at the timeliness of this filing.
>
> The defendant was tried and convicted before this very Court, and his conviction was affirmed November 5th of 2010. The petition for leave to appeal was denied March 30th of 2011. Therefore, a deadline for any post-conviction petition would have been December 28th of 2011. Defendant filed his post-conviction petition May 15th of 2015, four years late with regards to this filing. The Court finds it is grossly untimely. It is not just untimely; it is four years later than when it should be filed.
>
> The defense *** has argued that there was a lack of culpable negligence due to defendant's high level of escape. The Court is familiar with Mr. Everhart.

12

I'm very familiar with his level of escape. I believe during his trial I kept him shackled because he had escaped from this very building.

I see you smiling, Mr. Everhart. You recall. I kept you shackled during your trial because you had escaped from Courtroom 105 for a proceeding.

So, again, the Court finds that there is not a lack of culpable negligence in that the petition is grossly untimely."

¶ 40    The court also considered the merits of defendant's petition and found that he failed to establish any prejudice in his claims of ineffective assistance of trial and appellate counsel. The court held that defendant failed to show a substantial violation of his federal or state constitutional rights.

¶ 41    This appeal followed.

¶ 42    Defendant first argues that this court should reverse the dismissal of his petition as untimely because he pled facts supporting a lack of culpable negligence. Specifically, he contends that his affidavit set forth a sufficient basis to support a lack of culpable negligence due to his appellate counsel's assertions that he would handle defendant's postconviction filings as well as defendant's restricted access to the law library. Defendant further asserts that the trial court improperly made a credibility determination as to his statements in his affidavit and this court should remand for an evidentiary hearing. In response, the State maintains that the trial court properly dismissed defendant's petition as untimely because he failed to show a lack of culpable negligence for his more than three-year delay in filing.

¶ 43    The Post-Conviction Act (the Act) provides a three-stage mechanism in which a defendant under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Addison*, 2023 IL 127119, ¶ 18.

Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Id*. at 380. A proceeding brought under the Act is not an appeal of a defendant's underlying judgment, instead it is a collateral attack on the judgment. *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

¶ 44 This case proceeded to the second stage under the Act. At the second stage, the defendant may request counsel to be appointed to represent him or her, if necessary (725 ILCS 5/122-4 (West 2022)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2022)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). If no such showing is made, the petition is dismissed. If a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2022). When considering a motion to dismiss at the second stage of proceedings, we accept as true all factual allegations that are not positively rebutted by the record. *People v. Johnson*, 2017 IL 120310, ¶ 14. We review a petition dismissed at the second stage *de novo*. *Id*.

¶ 45 The issue of timeliness can first be addressed during second stage proceedings. *People v. Wheeler*, 392 Ill. App. 3d 303, 308 (2009). Section 122-1(c) of the Act provides:

> "No proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a petition for certiorari is not filed, no proceedings under this Article shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2022).

Stated differently, a defendant can avoid the dismissal of an untimely petition if he or she alleges facts demonstrating that the filing delay was not the result of his or her own culpable negligence. *Johnson*, 2017 IL 120310, ¶ 26.

¶ 46    Here, defendant's direct appeal was affirmed on November 5, 2010, and his PLA to the supreme court was denied on March 30, 2011. He did not file a petition for *certiorari* in the United States Supreme Court, and thus, his petition was due six months from the date the petition would have been due. It is undisputed that defendant's petition was due no later than December 28, 2011, but his postconviction petition was not filed until May 15, 2015. Defendant contends that he has alleged facts to show that the delay was not due to his culpable negligence based on his lack of legal expertise, his belief that his appellate lawyer was handling his postconviction petition, and his lack of access to the law library due to his high security status.

¶ 47    The culpable negligence standard contemplates something greater than ordinary negligence and is akin to recklessness. *People v. Lighthart*, 2023 IL 128398, ¶ 73; *Johnson*, 2017 IL 120310, ¶ 26. To establish a lack of culpable negligence, a defendant must present allegations of specific facts showing why his tardiness should be excused while vague or conclusory assertions will not suffice. *People v. Evans*, 2017 IL App (1st) 143268, ¶ 26. The defendant bears a heavy burden to affirmatively demonstrate why the exception to the time limits of the Act is applicable to his case. *People v. Kirilyuk*, 2024 IL App (2d) 230154, ¶ 33. The lack of culpable negligence is very difficult to establish. *Id*.

¶ 48    We first address defendant's explanation that his lack of legal expertise and his appellate counsel's alleged failure to explain the postconviction process should excuse his untimely petition. "It is well settled that all citizens are charged with knowledge of the law." *People v. Lander*, 215 Ill. 2d 577, 588 (2005) (citing *People v. Boclair,* 202 Ill. 2d 89, 104 (2002), quoting *Atkins v. Parker,* 472 U.S. 115, 130 (1985)). "Ignorance of the law or legal rights will not excuse

a delay in filing a lawsuit." *Id*. Thus, it is solely the defendant's obligation to know the time requirements for filing a postconviction petition. *Id*. "[T]o hold otherwise would vitiate the Act's time constraints because defendants could routinely escape them by 'pleading ignorance.' " *People v. Hampton*, 349 Ill. App. 3d 824, 829 (2004). Thus, defendant cannot rely on his lack of legal knowledge to show a lack of culpable negligence. It was his duty to be aware of the filing deadlines set forth in the Act and does not excuse his untimely petition.

¶ 49      Further, defendant has not alleged that his appellate counsel provided him with inaccurate advice or a clear indication that counsel was preparing his petition. Rather, he offered vague assertions that he was "under the impression" that his appellate counsel was handling his postconviction filings and that counsel "indicated that he would take care" of defendant's postconviction. Defendant then stated that after not hearing anything "for years," he began to prepare his own petition. He made no allegation that he attempted to contact his appellate counsel regarding his postconviction petition. Instead, he waited for an unspecified period of years before taking action. This failure to act falls within the same realm as pleading ignorance. As Illinois courts have observed, "culpable negligence entails blameable [*sic*] neglect involving ' "a disregard of the consequences likely to result from one's actions." ' " *Lander*, 215 Ill. 2d at 586-87 (quoting *Boclair*, 202 Ill. 2d at 106, quoting Black's Law Dictionary 1056 (7th ed.1999)). Taking defendant's statements as true, as required at the second stage, he cannot demonstrate a lack of culpable negligence when he allowed well more than three years to pass before he filed his own petition. His decision to passively wait years before following up on the status of any postconviction petition shows a disregard of these consequences and fails to show a lack of culpable negligence.

¶ 50      Defendant also contends that his lack of access to the law library and his legal papers showed his lack of culpable negligence. However, defendant's limited access was due to his own

classification as a high-risk for escape inmate. The trial court noted in her findings that defendant had previously escaped from a courtroom during his trial and was required to be shackled thereafter. A review of defendant's Department of Corrections record shows that he was convicted of escape in two different cases: escape with a dangerous weapon, a Class 1 felony (720 ILCS 5/31-6(d) (West 2022)), and escape from a penal institution, a Class 2 felony (720 ILCS 5/31-6(a) (West 2022)). See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29 (appellate court may take judicial notice of information on the Illinois Department of Corrections website).

¶ 51    We find *People v. Cortez*, 338 Ill. App. 3d 122, 130-31 (2003), helpful for our analysis of this argument. There, the reviewing court found that a defendant's showing that he was in segregation with limited access to the law library was insufficient to meet his burden of showing that his delay was not due to his "culpable negligence." In that case, the defendant's postconviction petition was untimely filed approximately 18 months after the Act's deadline. *Id.* at 124-25. When considering whether the defendant had shown a lack of culpable negligence, the court observed that the defendant's prison records showed that he was placed in segregation "due to his own misconduct" and his record was "replete with disciplinary violations." *Id.* at 131. The *Cortez* court found that the defendant's culpability was "undeniable." *Id.* " 'Engaging in intentional misconduct which would, with reasonably foreseeable certainty, result in prison action that would prevent one from filing in a timely manner would in all likelihood fall within the definition of culpable negligence as "negligence of a gross and flagrant character." ' " *Id.* (quoting *People v. Scullark*, 325 Ill. App. 3d 876, 887-88 (2001)).

¶ 52    Additionally, the court in *Cortez* noted that the defendant did not begin to prepare his petition until "long after the due date for filing had passed." *Id.* at 130. Further, the defendant did not provide specific dates that he was denied access to the law library, but instead made a more general allegation that he had " 'sharply reduced access.' " *Id.* at 131-32. Thus, the reviewing

court concluded that even if the defendant's segregation had not been the result of his own misconduct, he would still be culpably negligent under these circumstances. *Id*. at 132.

¶ 53 We find the analysis in *Cortez* applicable to the circumstances in this case. While defendant cites his high restrictions as an escape-risk inmate to show a lack of culpable negligence, this classification was due to his own misconduct, *i.e.*, two convictions for escape. As in *Cortez*, his culpability is "undeniable" when his own criminal actions caused this restriction to be imposed and cannot provide the basis to avoid the bar of an untimely filing.

¶ 54 Defendant further contends that his legal papers were not transferred from Menard to Pontiac in 2010 and 2011 and he did not regain his materials until 2013. According to defendant, this lack of access to his papers hindered his ability to prepare his petition. However, accepting defendant's allegations as true, defendant fails to explain why it took more than two years, until May 2015, to file his postconviction petition after his legal papers were returned to him. He has not offered any explanation that his delay was not due to his culpable negligence. Rather, defendant waited years to prepare and file his petition well after the Act's imposed deadline. None of his explanations demonstrated a lack of culpable negligence to excuse his untimely filing and dismissal on this basis was proper.

¶ 55 Finally, we are not persuaded by defendant's argument that the trial court improperly engaged in a credibility analysis without an evidentiary hearing. He asks this court to remand for an evidentiary hearing for this credibility determination. In support, defendant relies primarily on the holding in *Wheeler*. In that case, the reviewing court reasoned:

> "the Illinois Supreme Court has held that when a trial court determines whether or not a defendant was culpably negligent, the trial court must assess the defendant's credibility. *Boclair,* 202 Ill. 2d at 102. Such an assessment is not intended for a second-state dismissal hearing, where a trial court is foreclosed from fact finding

18

and all well-pleaded facts are taken as true. *Coleman,* 183 Ill. 2d at 380-81. Assessments of credibility are better suited to a third-stage evidentiary hearing ***." *Wheeler*, 392 Ill. App. 3d at 310.

¶ 56    Defendant contends that under *Wheeler*, "dismissals based on culpable negligence may be made at the second stage of proceedings only where the defendant failed to argue that any delay was not the result of culpable negligence and the State moved to dismiss the petition on that basis." He further asserts that if facts alleging a lack of culpable negligence have been pled, then a third-stage evidentiary hearing is required to assess a defendant's credibility. We reject defendant's argument.

¶ 57    First, the appeal in *Wheeler* was brought by the State after the trial court had granted postconviction relief on the merits at the second stage before the State filed an answer and without an evidentiary hearing. *Id*. at 306. The reviewing court found that the trial court's actions prevented the State from fulfilling its statutory obligation of filing an answer, with a premature grant of relief. *Id*. at 310. "If the drafters of the Act had contemplated a grant of relief at the second stage, then they would not have made an answer mandatory." *Id*. The *Wheeler* court remanded the case for an evidentiary hearing. *Id*. at 311 (citing *People v. Bumpers*, 229 Ill. 2d 632 (2008)). For these reasons, we find *Wheeler* easily distinguishable from the facts of the instant case.

¶ 58    Second, neither *Boclair* nor *Coleman* held that an evidentiary hearing was required to reach the issue of culpable negligence in an untimely petition. In *Boclair*, the supreme court considered whether timeliness could be considered by the trial court at the first stage of postconviction review. There, the defendants each filed untimely postconviction petitions and were dismissed at the first stage of proceedings. The supreme court reviewed the statutory language of section 122-2(a)(2) of the Act and determined that section only allowed for summary

19

dismissals if the petition was frivolous or patently without merit. *Id.* at 99-102. The *Boclair* court held that "the matter of untimeliness should be left for the State to assert during the second stage of the post-conviction proceedings." *Id.* at 102. The *Boclair* court did not consider whether the trial court could then rule on the matter of untimeliness at the second stage, only that the issue of untimeliness could not be raised until the second stage. *Id.*

¶ 59    In *Coleman*, the defendant raised several substantive claims in his postconviction petition, which was dismissed by the trial court at the second stage. Before the supreme court, the defendant argued that the trial court had erred because he was entitled to a third-stage evidentiary hearing on the merits of his claim. The supreme court observed that at the dismissal stage of a postconviction proceeding, at either the first or second stage under the Act, the trial court is "concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act." *Coleman*, 183 Ill. 2d at 380.  Thus, the *Coleman* court held that the trial court must take all well-pleaded facts in the postconviction petition and affidavits as true. *Id.* at 380-81. No issue of timeliness was raised in *Coleman*.

¶ 60    Moreover, multiple supreme court cases have considered the issue of culpable negligence during second-stage proceedings without requiring an evidentiary hearing. See *Lighthart*, 2023 IL 128398, ¶ 76 (finding the defendant was not culpably negligent in filing her petition "where it was impossible to calculate a six-month deadline based on the statutory language at the time," the only existing precedent established that the dismissal of her notice of appeal was akin to no appeal, and she filed her petition within three years of her conviction); *People v. Perkins*, 229 Ill. 2d 34, 50-53 (2008) (holding that postconviction counsel is required under Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. Jul. 1, 2017)) to amend an untimely petition to allege any available facts to show a lack of culpable negligence and that counsel in that case complied and

the second stage dismissal was affirmed); *Lander*, 215 Ill. 2d at 586-88 (finding that while the examination of the circumstances surrounding a defendant's delayed filing is fact-specific, the court ultimately decided that the defendant had not pled sufficient facts to show a lack of culpable negligence in filing an untimely petition). Notably, none of these cases held that the determination of culpable negligence required an evidentiary hearing, as suggested by defendant.

¶ 61    Because it is undisputed that defendant filed his petition more than three years after the deadline imposed under the Act, defendant was required to demonstrate that his untimely filing was due to a lack of culpable negligence. Defendant failed to do so and, accordingly, the trial court did not err in dismissing defendant's petition at the second stage of postconviction proceedings.

¶ 62    Since the trial court properly dismissed defendant's postconviction petition as untimely, we need not reach the merits of his claims. See *Perkins*, 229 Ill. 2d at 41 ("Under the Act, a petitioner's claims cannot be presented if they are untimely and the petitioner has not alleged facts showing the delay in filing was not due to his culpable negligence.").

¶ 63    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 64    Affirmed.